**2023 IL 128740**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 128740)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
PIERRE MONTANEZ, Appellant.

*Opinion filed November 30, 2023.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

Justice Rochford took no part in the decision.

**OPINION**

¶ 1    A Cook County jury found defendant, Pierre Montanez, guilty of multiple offenses, including the first degree murder of two victims, Roberto Villalobos and Alejandra Ramirez, which resulted in a mandatory natural life sentence. Defendant challenges the circuit court's denial of his request for leave to file a successive

postconviction petition pursuant to the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et. seq.* (West 2018)). Defendant requested leave to file a successive postconviction petition to raise a claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence relevant to his defense; evidence that was stored in a file in the basement of the Chicago Police Department was not given to the prosecution or defense and was discovered after his convictions. We conclude that defendant cannot establish cause for filing a successive postconviction petition. Therefore, we affirm the circuit court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3                           A. Defendant's Trial and Direct Appeal

¶ 4        A Cook County jury found defendant guilty of the first degree murder of Villalobos and Ramirez, aggravated vehicular hijacking, and aggravated kidnapping. The circuit court sentenced defendant to mandatory natural life for the two first degree murder convictions, a 20-year consecutive sentence for the aggravated vehicular hijacking conviction, and a 27-year consecutive sentence for the aggravated kidnapping conviction.

¶ 5        Defendant's convictions stem from events that occurred in the early morning hours of August 28, 2002, as described by several eyewitnesses. On August 27, 2002, Anais Ortiz, who was 15 years old, skipped school and spent the day smoking and drinking with Jose Luera[1] and defendant at Luera's home. Ortiz knew Luera through their mutual gang affiliations, but she did not know defendant very well, having met him on maybe one previous occasion. Ortiz's friend, Claudia Negrett, also spent the day with her at Luera's home.

¶ 6        When Ortiz and Negrett were ready to go home, Luera called Villalobos for a ride. Ortiz knew Villalobos because he "sold weed in the neighborhood." Sometime between 11:30 p.m. to 12 a.m., Villalobos and Ramirez (the victims of defendant's crimes), arrived at Luera's home in Villalobos's gray Chevy Caprice. According to Ortiz, she, Negrette, defendant, and Luera got into the back seats of Villalobos's

_____

[1]Luera was a codefendant who was tried separately.

Caprice while Ramirez sat in the front passenger seat. Villalobos drove them to within a block of Negrette's house and dropped off Ortiz and Negrette. He then drove off with Ramirez still in the front passenger seat and defendant and Luera in the back seat.

¶ 7 Ortiz was the only witness at defendant's trial who testified about the events leading up to defendant getting in the back of Villalobos's Caprice that evening. She was the only eyewitness who placed defendant in Villalobos's vehicle during the early morning hours of August 28, 2002.

¶ 8 Around midnight that evening, another eyewitness, John McDonnell, had just returned home from a local tavern and stood on his front porch going through his mail. McDonnell saw a vehicle, which he later identified as Villalobos's Caprice, parked across the street from his house. As McDonnell stood on his porch, he saw a person, who he later identified as Villalobos, climb out of the back window of the Caprice, on the driver's side, asking for help. Another individual, whom he later identified as Luera, immediately climbed out of the same window. McDonnell watched Villalobos back up from the car while Luera started punching him in the face. Villalobos staggered and fell to the ground, and Luera continued punching Villalobos on the ground while Villalobos tried to defend himself.

¶ 9 McDonnell approached, told Luera to get off, and was going to pull Luera off Villalobos, but he paused when saw a flash of a "little light" near the Caprice, possibly from inside the vehicle. He was concerned that more people may be inside the car. Luera stood up from punching Villalobos, and Villalobos, covered in blood, stood up and moved behind McDonnell using him as a shield and asking him for help. McDonnell and Villalobos backed up onto McDonnell's driveway. Luera drew a knife and approached them. When Luera pulled out the knife, McDonnell ran behind his house to grab a piece of lumber. He returned to the front of his house armed with a two-by-four. He then saw the Caprice driving away with the right passenger door open and saw Villalobos lying on his driveway with multiple stab wounds. McDonnell called 911. Villalobos died from the stab wounds while lying on McDonnell's driveway.

¶ 10 Shortly after midnight that same evening, Jason Samhan saw a gray Caprice, which he later identified as Villalobos's Caprice, run through a red light without its headlights on and almost hitting his car. Samhan saw blood on the Caprice's

driver's side door. Samhan also saw a woman with her head out of a back window of the Caprice and a man's hand coming from the back seat choking the woman's neck. The woman was screaming and trying to fight back. Samhan called 911 and reported what he saw. He could not see the person who was driving the Caprice or the person who was choking the woman.

¶ 11    Around 1:45 that same morning, the night manager of a gas station watched defendant enter the convenience store of the gas station with scratches on his face and neck. Defendant asked the night manager where the gas cans were and grabbed two one-gallon gas cans for purchase. Defendant told the manager that he needed gas because his girlfriend ran his van out of gas while he was at work. The night manager told defendant that it would be cheaper to buy one gas can for putting gas in the van and then drive the van back to put gas in it. Defendant, nonetheless, bought the two gas cans, filled them with gas, and walked off.

¶ 12    Samson Murray was in the parking lot of a nearby restaurant smoking a cigarette and talking to his friend, Nick Buogos. Murray watched defendant approach Buogos's car from the direction of the gas station carrying the two gas cans. Defendant told Buogos that he needed to talk to him. Buogos and defendant then drove away together in Buogos's vehicle.

¶ 13    Sometime during the early morning hours on August 28, 2002, someone doused Villalobos's Caprice with gasoline and set it on fire on a residential street located approximately one mile from the gas station where defendant bought the two cans of gas. Officers investigating the burned vehicle could smell the strong odor of gasoline. They found blood in the vehicle's interior and on its exterior and gasoline inside the vehicle's passenger compartment and on the ground near the vehicle. Ramirez's deceased body lay bent over in the back seat. Investigators determined that she died from multiple stab wounds and strangulation.

¶ 14    Several DNA samples collected at the crime scene consisted of a mixture of DNA profiles from more than one person, and defendant was excluded as contributing to most of these DNA samples. However, DNA collected underneath Ramirez's fingernails from both hands consisted of a mixture of DNA profiles, and defendant could not be excluded from this DNA mixture.

¶ 15 Police investigators interviewed defendant on November 16, 2002. They saw a burn scar on defendant's left arm near his wrist. Defendant told the officers that he burned his left arm and right leg on the Fourth of July. Defendant's attorney, who had accompanied defendant to the interview, gave the officers a prescription for burn treatment cream, as well as a doctor's note dated "July" and signed by "Dr. E. Cabrera." However, according to Dr. Ernest Cabrera, he never treated defendant "at any time for any reason" and did not sign the doctor's note that defendant's attorney gave to the officers.

¶ 16 Defendant told the officers that he was aware that he was on camera purchasing the two cans of gas the evening of the murders and vehicle fire. He explained that he was riding in a car with Buogos and they ran out of gas. According to defendant, Buogos stayed with the car while he went to get the gas and returned with the gas cans.

¶ 17 At the conclusion of defendant's trial, the jury found defendant guilty of the first degree murder of Villalobos and Ramirez, aggravated vehicular hijacking, and aggravated kidnaping. On direct appeal, the only issue defendant raised was a claim that the State engaged in prosecutorial misconduct during its closing argument by misstating the trial evidence. The appellate court rejected this claim and affirmed defendant's convictions and sentences.

¶ 18                    B. Defendant's Initial Postconviction Proceeding
                   and His Appeal From the Dismissal of That Proceeding

¶ 19 On December 8, 2014, defendant filed his initial *pro se* postconviction petition pursuant to the Postconviction Act (725 ILCS 5/122-1 *et seq.* (West 2014)). Defendant proceeded *pro se* for a majority of this initial postconviction proceeding, and he filed an extraordinarily large number of *pro se* pleadings in support of his claims. Our focus in this case is whether defendant should be allowed to file a successive petition. As explained in greater detail below, cause for filing a successive postconviction petition requires a defendant to show some objective factor external to the defense that impeded his efforts to raise a claim in an earlier proceeding. *Id.* § 122-1(f); *People v. Davis*, 2014 IL 115595, ¶ 14. Therefore, to assess the presence of such an external impediment, or lack thereof, we must consider defendant's extensive *pro se* pleadings that he filed in his initial

postconviction proceeding, and we set out those pleadings here with particular detail.

¶ 20     In defendant's initial *pro se* petition, defendant raised 18 claims of purported constitutional violations, which included a wide array of assertions directed at the conduct of his trial counsel, appellate counsel, the circuit court judge, the prosecution, and the sufficiency of the evidence. Shortly after filing his initial petition, defendant filed a *pro se* supplemental petition for postconviction relief adding an additional claim (claim XIX) alleging a *Brady* violation based on an assertion that the State failed to disclose a plea deal with Ortiz on a pending armed robbery charge in exchange for her testimony at defendant's trial.

¶ 21     On March 13, 2015, the circuit court advanced defendant's postconviction petition to the second stage of the postconviction proceedings and appointed counsel to represent defendant in the proceedings. Defendant, *pro se*, subsequently filed another amendment to his petition raising another claim (claim XX), alleging an additional assertion of ineffective assistance of appellate counsel.

¶ 22     Meanwhile, in an unrelated civil rights case pending in federal court, the federal court gave civil rights attorney Candace Gorman access to certain files of the Chicago Police Department (CPD) related to prior felony investigations. During her inspection of these files, she found a file related to defendant's case. On December 3, 2015, Gorman sent a letter to defendant informing him of the discovery of the file. Gorman informed defendant that she could not share the information from the file directly with him but that she wanted to do so with "any attorney that had represented [him]." She included an authorization form for defendant to sign that would have allowed Gorman to contact defendant's attorney so the attorney could review the CPD file.[2]

¶ 23     The *Brady* violation at issue in the present appeal centers on the State's failure to disclose this CPD file to defendant's attorney in pretrial discovery. The record

_____

[2]The files Gorman had access to are also referred to as "street files." See *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (noting that "street files" are CPD files that had been wrongfully withheld from the state's attorney and defense counsel in many homicide cases). Gorman conducted a systematic review of the CPD's street files as part of her representation of a litigant in an unrelated civil rights case. See *Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020). The files had been discovered in the basement of a Chicago police station. We refer to the file referenced in Gorman's August 3, 2015, letter pertaining to defendant's case as the CPD file.

does not establish when defendant received Gorman's December 3, 2015, letter but does establish that he received it sometime prior to April 26, 2016, while his initial postconviction proceeding was still pending.

¶ 24    On December 22, 2015, defendant filed a motion to dismiss his appointed postconviction counsel, alleging that the assistant public defender appointed to his case had refused to raise claims of misconduct and bias against the circuit court judge presiding over the proceeding. Defendant also filed a *pro se* motion for substitution of judge on January 7, 2016, alleging that he had filed a judicial inquiry board complaint against the judge on the basis that the judge had conspired with the State to suppress the State's plea agreement with Ortiz and had "clear hostility" toward defendant's constitutional rights. On March 11, 2016, defendant filed a *pro se* supplement to his motion to dismiss the public defender, alleging that he "refus[ed] inappropriate advances towards [him]" and that the public defender was threatening to remove his *pro se* claims.

¶ 25    On March 16, 2016, the circuit court conducted a hearing on defendant's request to proceed *pro se*. The circuit court admonished defendant about the consequences of proceeding *pro se*, and defendant stated that he understood those consequences and that he understood that he was entitled to legal representation but insisted that he wanted to represent himself. The circuit court, therefore, granted defendant's request and entered an order vacating the appointment of the public defender as defendant's postconviction counsel. The circuit court's order stated that it was entered upon defendant's *pro se* motion and with defendant "having been admonished." Defendant then proceeded *pro se* for the remainder of this initial postconviction proceeding. After a hearing before a different judge, the circuit court also entered an order denying defendant's *pro se* motion to remove the judge presiding over his case, concluding that defendant's allegations of impropriety had no merit.

¶ 26    On April 26, 2016, defendant filed a 75-page, handwritten *pro se* first amended petition for postconviction relief (first amended petition) in which he asserted 46 claims of alleged constitutional violations. Particularly relevant to this appeal, claim XXIII of defendant's first amended petition alleged as follows: "The State through its agents, specifically, the Chicago Police Department[,] has knowingly and deliberately suppressed exculpatory evidence from [defendant], which was

never turned over on discovery, in violation of *Brady v. Maryland*." For the "factual basis" of this claim, defendant alleged, "See letter from H. Candace Gorman dated December 3, 2015, as is attached hereto." The subject of Gorman's letter, the CPD file, is the basis of the *Brady* violation claim defendant now seeks leave to raise again in a successive postconviction petition.

¶ 27    After filing the first amended petition, defendant filed a motion for discovery "pursuant to *Brady v. Maryland*." Defendant sought discovery related to his *Brady* violation claim alleged in count XIX, which was based on Ortiz's plea agreement; the motion did not seek discovery with respect to the *Brady* violation alleged in count XXIII, which was based on the nondisclosure of the CPD file. The discovery motion sought, among other things, documents related to Ortiz's plea agreement with the State. Defendant also sent a request for information concerning Ortiz's plea agreement to the state's attorney's office pursuant to the Freedom of Information Act (FIOA) (5 ILCS 140/1 *et seq.* (West 2016)). Defendant did not send any FOIA request for information concerning the CPD file.

¶ 28    The parties appeared in court on June 1, 2016, on defendant's request to see the state's attorney's file with respect to Ortiz's criminal charges and any plea offer Ortiz may have received from the State in return for her testimony. The circuit court conducted an *in camera* inspection of the state's attorney's file and gave defendant a copy of some notes from the file relevant to the State's plea negotiations with Ortiz which, the court stated, were the only things in the file that were in any way discoverable to defendant. At this hearing, defendant did not mention Gorman's letter, the CPD file that Gorman referenced in her letter, or his desire to see the contents of the CPD file referred to in count XXIII of his first amended petition.

¶ 29    In support of the 46 claims alleged in his first amended postconviction petition, defendant filed a multitude of *pro se* motions, supplements, amendments, addendums, and memorandums during the second stage of this initial postconviction proceeding. Defendant's *pro se* filings included a motion for leave to file a supplement to his first amended petition for postconviction relief; a motion for leave to file a supplemental memorandum in support of his first amended petition for postconviction relief; an addendum to his first amended petition for postconviction relief; a motion for leave to file a supplemental appendix in support of his first amended petition, addendum, and supplement for postconviction relief;

a motion for rehearing on the denial of his motion to remove the judge presiding over his case; a second motion for a finding that the judge presiding over his case was unfit to continue as judge; a third motion seeking a substitution of judge; a second addendum to the first amended petition for postconviction relief; a motion objecting to "the State's Attorney's office representation" of the judge presiding over the proceedings; a motion to show cause why a special prosecutor should not be appointed; a motion for sanctions against the state's attorney's office; a complaint against the prosecutor filed with the Attorney Registration and Disciplinary Commission (ARDC); a motion to show cause why the assistant state's attorney representing the State in the proceeding should not be held in contempt; a notice of intent to argue that his natural life sentence was unconstitutional; a motion to amend the postconviction petition to cure asserted defects; a supplemental motion for leave to amend the postconviction petition to challenge a void judgment; a second supplemental petition for postconviction relief; a second addendum to his first amended petition; and a motion to vacate judgment.[3]

¶ 30     None of these pleadings concerned or mentioned count XXIII of the first amended petition, which alleged a *Brady* violation for nondisclosure of the entire CPD file. Ortiz being the only witness that established defendant's presence in Villalobos's Caprice, defendant focused his efforts in the postconviction proceeding primarily on discrediting Ortiz's testimony. Therefore, many of defendant's *pro se* pleadings centered on defendant's *Brady* violation claim that was based on his assertion that the State failed to disclose Ortiz's alleged plea agreement in exchange for her testimony.

¶ 31     For example, on June 22, 2016, defendant filed a motion to vacate judgment in which he cited *Brady* and argued the elements he must show to establish his *Brady* violation claim. He argued that the State violated *Brady* by not disclosing Ortiz's plea, that the nondisclosed evidence was material and favorable to his defense, and

---

[3]Defendant also filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (725 ILCS 5/2-1401 (West 2016)) alleging that his convictions were void because Oritz provided false testimony as well as a motion for summary judgment on his "fraudulent concealment" allegation in the section 2-1401 petition concerning Ortiz's plea agreement.

that the circuit court should vacate his convictions due to this *Brady* violation. This motion did not seek any relief due to the nondisclosure of the CPD file.

¶ 32 On June 28, 2016, defendant filed a second motion for discovery requesting "additional documents which are in the State's possession to further support his claim of perjury on the part of Ortiz." Again, this motion did not include any discovery requests with respect to the CPD file, and defendant did not file a similar motion for discovery with respect to the CPD file.

¶ 33 In February 2017, defendant filed another supplement to his petition for postconviction relief in which he sought to supplement, among other claims, claim XIX of his first amended postconviction petition with additional allegations in support of his claim that "the State, in violation of *Brady v. Maryland*, failed to disclose to the defense that, in exchange for witness testimony from Anna Ortiz, it provided a deal to Ortiz on her pending armed robbery charge." Defendant's *pro se* supplement to claim XIX included a discussion of the elements that he must allege and prove to establish a *Brady* violation, with citations of authority and an analysis to support his conclusion that claim XIX of his first amended petition satisfied those elements. Defendant did not seek to supplement claim XXIII at any time during the second-stage proceedings.

¶ 34 On February 7, 2017, the State filed a motion to dismiss defendant's postconviction proceeding. With respect to defendant's *Brady* violation claim based on the alleged failure to disclose Ortiz's plea agreement, the State argued that defendant had no factual support for his conclusion that Ortiz was given a deal in exchange for her testimony. The State argued that defendant's *Brady* violation claim was "a broad conclusory statement with no basis in fact" and was unfounded.

¶ 35 Defendant filed a motion to strike the State's motion to dismiss or, in the alternative, to require the State to provide a more definite statement. Defendant's responsive pleading did not raise any issues with respect to the CPD file alleged in count XXIII of his first amended petition.

¶ 36 On July 31, 2017, the circuit court conducted a hearing on the State's motion to dismiss. At the hearing, the State waived any additional argument on the motion to dismiss but reserved rebuttal argument. Defendant's oral argument against the motion to dismiss focused primarily on his claim that the State violated *Brady* by

failing to disclose Ortiz's plea deal and that the State relied on Ortiz's false testimony to convict him. Defendant also argued that his attorney was ineffective for failing to investigate Ortiz's plea agreement with the State.

¶ 37　　Defendant offered no argument with respect to the *Brady* violation alleged in claim XXIII of his first amended petition, and he did not ask the circuit court to allow additional time for any discovery on this *Brady* violation claim prior to a ruling on the State's motion to dismiss. The circuit court took the matter under advisement.

¶ 38　　On August 29, 2017, the parties appeared in court for a ruling on the State's motion to dismiss. The circuit court asked defendant if there was anything else he wanted to add, and defendant stated that he had nothing further with respect to his postconviction claims. The circuit court then ruled as follows: "For reasons set forth in the State's motion to dismiss, that motion is granted. Postconviction petition is dismissed."

¶ 39　　On September 28, 2017, defendant filed a *pro se* motion to reconsider the dismissal of the postconviction petition in which he raised various constitutional assertions in support of his request for reconsideration. Again, in this motion, defendant did not mention Gorman's August 3, 2015, letter, the CPD file, or the need for discovery on the claim alleged in count XXIII. He also filed a pleading purporting to be amendments to claims in his postconviction petition, arguing that the circuit court had lacked personal and subject-matter jurisdiction to enter the judgment of conviction because the indictments were unconstitutional. Defendant also filed a supplemental motion for leave to amend the postconviction petition to challenge a void judgment. In both of these pleadings, defendant sought to add a claim to his postconviction petition that section 111-3(a) of the Code of Criminal Procedure (725 ILCS 5/111-3(a) (West 2016)), which concerns the form of indictments, was unconstitutionally vague, which deprived the circuit court of jurisdiction to enter the judgment of conviction.

¶ 40　　On February 15, 2018, the parties appeared in court on defendant's motion to add these additional claims to his postconviction petition. The State reminded the court that it had already granted the State's motion to dismiss, and the court then denied defendant's motion to add these additional claims, stating "your only other option is to file a successive postconviction petition." The circuit court then

scheduled a hearing on defendant's motion to reconsider the dismissal of the postconviction proceeding.

¶ 41        On March 8, 2018, defendant filed a supplemental motion for reconsideration of the dismissal of the postconviction proceeding with the stated purpose, in part, of bringing to the court's attention "newly discovered evidence that was not available at the time of the first hearing." The alleged "newly discovered evidence" set out in the motion was an assertion that the judge presiding over his postconviction proceeding was a "material witness" because "to reach the question of his jurisdiction" he had to "affirmatively prove he had jurisdiction," which made the judge a "material witness to the issue of his jurisdiction." Defendant further alleged that the judge was a material witness because the judge was "aware of the deal between Anais Ortiz and the State, and that the judge knew Ortiz was committing perjury when she testified that she did not enter into any deal for her testimony." This motion contained 18 pages of allegations, legal arguments, and citations of authority. The motion included no mention of the CPD file or Gorman's August 3, 2015, letter.

¶ 42        Meanwhile, in February 2018, after completion of the extensive second-stage litigation in the postconviction proceeding, resulting in the dismissal order, but while defendant's motion to reconsider the dismissal order was still pending, defendant filed a complaint against Gorman with the ARDC pertaining to her December 3, 2015, letter and her possession of the CPD file. Other than filing count XXIII, this is the first action defendant took with respect to the CPD file that is reflected in the record. In a response letter addressed to the ARDC dated March 14, 2018, Gorman explained that she had discovered the CPD file concerning defendant's case while she was conducting discovery in the unrelated civil case in federal court. She further explained to the ARDC that the federal court had entered a protective order limiting access to the information in the CPD files to only the attorneys who were representing the defendants, excluding access to the defendants themselves. She explained that she contacted defendant but did not receive authorization from him to discuss the CPD file with any of his attorneys prior to expiration of the federal court's discovery deadline. Gorman added, however, that she still had possession of the CPD file and that "[i]f an attorney contacts me on [defendant's] behalf and signs off on the protective order I can tender the file to

that attorney." On March 29, 2018, the ARDC provided defendant with a copy of Gorman's response letter.

¶ 43    On May 2, 2018, the parties appeared in court for a hearing on defendant's motion and supplemental motion to reconsider the circuit court's dismissal order. At the outset, defendant stated that "there is a matter I would like to bring to the court's attention." Defendant then referred to Gorman's December 3, 2015, letter concerning the CPD file, telling the court that Gorman informed him that she could not provide him with the information contained in the CPD's file.

¶ 44    The circuit court responded that it was not familiar with the files referred to in Gorman's letter and that it needed more information. The court stated that it would contact Gorman and require her to appear with the file. The State pointed out that Gorman's letter was dated December 3, 2015. The court then asked defendant when he received the letter. He did not answer this question but instead responded that Gorman had also contacted his grandparents informing them that she had the CPD file pertaining to defendant's case but that she could give information from the file only to an attorney. Defendant claimed that he attempted to contact his trial attorney, but the attorney did not want to get involved. Defendant did not say when any of these communications allegedly took place.

¶ 45    Defendant orally informed the court about his February 2018 ARDC complaint against Gorman and that the ARDC informed him that *pro se* litigants were not allowed to have information from the CPD file pursuant to the federal order. Based on the parties' discussions at this hearing, the circuit court concluded, "we can't go anywhere until we see what [Gorman] has." The court, therefore, continued the hearing on defendant's motion to reconsider and supplemental motion to reconsider, although neither motion included any allegations pertaining to the CPD file.

¶ 46    On May 8, 2018, the parties appeared in court, and the circuit court informed defendant that it was still making phone calls "on that issue of those alleged police reports found in the basement" of the CPD. Defendant showed the circuit court Gorman's letter responding to his ARDC complaint and stated that he and his grandparents responded to Gorman and made contact with his trial attorney, who refused to get involved. The circuit court stated that it would try to get in touch with the federal judge presiding over Gorman's lawsuit.

¶ 47        The parties appeared in court again on May 21, 2018, and the circuit court stated that it had determined that the federal case was completed and was on appeal and stated that it had been attempting to contact Gorman for a week. The circuit court gave Gorman's phone number to the assistant state's attorney and directed her to attempt to contact Gorman as well.

¶ 48        The parties returned to court on June 28, 2018, and the assistant state's attorney informed the court that Gorman could not release the CPD file to anyone without a subpoena and that they needed the circuit court's permission to issue the subpoena. The circuit court directed the State to issue a subpoena for the CPD file to be sent to the court for an *in camera* review.

¶ 49        On July 31, 2018, the parties appeared in court in front of a new judge, and the assistant state's attorney informed the court that she had obtained the CPD file from Gorman. The assistant state's attorney stated:

> "I did review what was in those files compared to what the defense attorneys were tendered in pretrial, and there was one report that was different. However, the content of that report, the exact content of that report was contained in another report that was expanded on, and that expanded report was tendered. So, based on the comparison, there were no reports, nothing that wasn't tendered at pretrial that the defendant was not entitled to in pretrial discovery."

¶ 50        The circuit court ordered the State to tender a copy of the new report to defendant. Defendant objected to the State reviewing the file to determine what should be disclosed instead of the circuit court conducting an *in camera* inspection. Defendant argued that the judge who had presided over the previous hearing had ordered an *in camera* inspection. The circuit court, however, stated:

> "[A]s an officer of the court, I trust [the assistant state's attorney] went through everything that she was able to find that relates to you. And then what relates to you—because you're not allowed to get anything that relates to anybody else. So, whatever she found that relates to you—what she told me was a five page document—I'm telling her to tender that to you. *** I don't need to go through everything else when it has no relation to you. I take her word for it, as an officer of the court, that she went through everything; and what related to you, she took out, and I'm telling her to tender that to you."

- 14 -

¶ 51       At a status hearing held on August 21, 2018, defendant told the court that, after his review of the tendered report, he had determined that McDonnell's testimony at the trial was different than his statements as reflected in the report tendered from the CPD file. Defendant argued that either the State did not provide this information to his attorney prior to the trial or, if it did, his attorney was ineffective for failing to cross-examine McDonnell with the inconsistent statements. The State disagreed and stated that there was no difference in McDonnell's statements in the report and his testimony at the trial.

¶ 52       The circuit court told defendant that he had to establish that the State withheld any information concerning McDonnell's statements and noted that there were "plenty of times an attorney can choose a certain route to cross-examine because it benefits, or he thinks it benefits his client." Defendant asked for clarification as follows:

> "It's the State's position that counsel had the discovery that was tendered over on the last court date, and it's my position that the defense did not have that. How do we get to the bottom of that, Judge *** could I receive leave to amend to show how it affected my trial, Judge?"

The circuit court responded,

> "[W]hatever you want to do with that issue, you can address it on the next court date. I'm going to take care of all of this on the next court date. I'm going to rule on your motion to reconsider. *** I'm going to read everything, and then whatever you want to argue to me about that report, you can argue between then and the next court date, okay?"

Defendant asked, "Judge, just so I can make sure I understand, the court wants me to present argument with respect to how I would use the material that was tendered to me?" The court responded, "You can make whatever arguments you want with respect to that police report on the next court date, okay?"

¶ 53       On September 17, 2018, defendant filed a third amended petition for postconviction relief in which he raised a *Brady* violation claim based on the State's failure to tender the report found in the CPD's file. Specifically, defendant defined the claim as follows: "The State failed to turn over a police report which would

- 15 -

have affected the credibility of multiple witnesses for the state in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)."

¶ 54     Defendant's third amended petition for postconviction relief included 16 pages of argument setting out the basis for his claim that the State violated *Brady* by failing to disclose the report, including citations of authority and analysis of the materiality of the evidence and how he believed it would have been useful to his defense had it been disclosed. He argued that the State's failure to disclose the report found in the CPD's file was a *Brady* violation that had a cumulative effect with the State's *Brady* violation related to Ortiz's plea agreement. With respect to the timing in which he was raising the *Brady* claim pertaining to the report, defendant explained in the third amended petition that, because his motion to reconsider the dismissal of the postconviction proceeding was still pending on May 2, 2018, on that day he advised the court of Gorman's letter and the federal protective order. Defendant's third amended petition did not include any *Brady* analysis with respect to the entirety of the file, only the report tendered from the file.

¶ 55     At an October 11, 2018, hearing, the circuit court again asked defendant how he intended on showing that, prior to his trial, his trial attorney did not have the information contained in the report tendered from the CPD file as alleged in his third amended petition. The circuit court emphasized that the defendant must show proof that his attorney lacked that information. It stated, "you have to present some kind of evidence, in your motion make clear what kind of evidence you have to support that."

¶ 56     Defendant referred to the transcript of his trial attorney's cross-examination of McDonnell, which, defendant argued, showed that his attorney did not have the information. The circuit court, however, stated that it did not see anything to establish that defendant's trial attorney lacked the information contained in the report and advised defendant that he must have some kind of evidence by way of an affidavit or some other evidence, noting that it was a "pretty strong allegation to make."

¶ 57     The parties returned to court on November 29, 2018, and the circuit court asked defendant whether he had "something specific to point to that you're saying your lawyers didn't get something?" Defendant again complained about the circuit court

- 16 -

not reviewing the CPD file, and the court stated that, if it had reviewed the CPD file, it would not know what it was looking for. Defendant responded that his understanding was that his trial attorney was going to turn over his file to the court, but the court responded that it was not its job to go through and review all of the reports in the defense attorney's file and that it was the defendant's obligation to establish specific issues and not just "fish for something." At the conclusion of this hearing, the circuit court denied defendant's motion to reconsider the dismissal of the postconviction proceeding.[4]

¶ 58    Defendant appealed the dismissal of his initial postconviction proceeding. The only issue defendant raised in that appeal was that the circuit court erred because he had made a substantial showing that the State committed a *Brady* violation by failing to disclose that Ortiz testified with the expectation of receiving a plea bargain in her own pending criminal case. Defendant did not challenge the circuit court's dismissal of count XXIII of the first amended petition, which alleged a *Brady* violation stemming from the State's failure to disclose the entire CPD file during pretrial discovery; he did not raise any issues with respect to the circuit court's procedure in having the State review the CPD file during hearings on defendant's motion to reconsider the dismissal of his postconviction claims; and he did not argue that the dismissal was in error due to the alleged *Brady* violation based on the report tendered from the CPD file.

¶ 59    With respect to the *Brady* issue that defendant did raise on appeal, the appellate court held that defendant failed to establish that Ortiz received a promise of any kind regarding her pending criminal case prior to testifying at defendant's trial. *People v. Montanez*, 2021 IL App (1st) 191065-U, ¶ 40. In addition, the appellate court observed that defense counsel did attempt to impeach Ortiz by telling the jury that she came into the courtroom wearing a jail uniform and fighting her own case. *Id.* ¶ 46. The appellate court also held that, even if there was evidence that Ortiz testified pursuant to a plea deal, the State presented ample evidence that defendant, at a minimum, was accountable for the murders of Villalobos and Ramirez based on the other evidence presented at the trial including, but not limited to, testimony from the gas station manager and defendant's false statements to investigators. *Id.* ¶¶ 47-52. The appellate court therefore concluded that, had defendant established

_____

[4]The circuit court also dismissed defendant's section 2-1401 petition.

evidence of a plea agreement, this would not have undermined confidence in the jury's finding of guilt. *Id.* ¶ 53. The appellate court found that defendant "received a fair trial, and the outcome was worthy of confidence." *Id.*

¶ 60                                    C. Defendant's Motion for Leave
to File a Successive Postconviction Petition

¶ 61       While defendant's appeal of the dismissal of his initial postconviction petition was still pending, on April 22, 2019, defendant filed a *pro se* motion for leave to file a successive postconviction petition; this motion is the subject matter of the present appeal.

¶ 62       In his motion, defendant alleged that he was unable to secure the CPD file in Gorman's possession during his initial postconviction proceeding due to his *pro se* status. He alleged that, prior to his jury trial, he did not have the report that was tendered to him upon inspection of the CPD file and that the State's failure to produce the report in pretrial discovery was a *Brady* violation. He maintained that the tendered report contained information favorable to his defense and that there was a reasonable probability that the outcome of his trial would have been different had the report been disclosed.[5]

¶ 63       On August 15, 2019, the circuit court summarily denied defendant's request for leave to file a successive postconviction petition. The circuit court stated that "the issues raised and presented are frivolous and patently without merit."[6] In its written order, the circuit court stated that defendant had "failed to allege even a bare factual basis to support his claim," including failure to show any evidence that the State

---

[5]Defendant's motion for leave to file a successive petition also raised a claim challenging his natural life sentence under *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny; this claim is not at issue in this appeal.

[6]The frivolous and patently without merit standard is the incorrect standard, as it applies for evaluating initial postconviction petitions at the first stage; it is a lower standard than the cause and prejudice test for filing a successive petition. *People v. Smith*, 2014 IL 115946, ¶ 35. Regardless, our review is the correctness of the circuit court's result, not the correctness of its reasoning. *People v. Nash*, 173 Ill. 2d 423, 432 (1996).

suppressed any favorable material.

¶ 64                    D. Defendant's Appeal From the Circuit Court's
                    Denial of Leave to File a Successive Postconviction Petition

¶ 65        Defendant appealed from the circuit court's order denying him leave to file a
successive postconviction petition, arguing that the State improperly participated
in the leave-to-file stage of the proceeding. He also argued that he satisfied the
cause and prejudice test for filing a successive postconviction petition to raise two
*Brady* violation claims: (1) the State's failure to disclose the report discovered in
the CPD file and (2) the State's failure to disclose the entire CPD file. 2022 IL App
(1st) 191930, ¶ 1. The appellate court rejected defendant's arguments and affirmed
the circuit court's denial of defendant's request for leave to file the successive
postconviction petition. *Id.* ¶ 2.

¶ 66        In support of his claim that the State improperly participated in the
determination of whether he should be allowed to file the successive postconviction
petition, defendant argued that the State impermissibly participated by reviewing
the CPD file and determining what he was entitled to access from the file. *Id.* ¶ 33.
The appellate court rejected this argument because the parties' discussions
concerning what defendant was entitled to receive from the CPD file took place
during the second stage of defendant's initial postconviction petition, not during a
determination of whether defendant should be allowed to file a successive
postconviction petition. *Id.* The appellate court noted that, when the CPD file was
reviewed to determine what defendant was entitled to receive from the CPD file,
the "defendant had neither filed his motion [for leave to file a successive
postconviction petition] nor [given] any indication that a motion for leave to file
was imminent." *Id.* ¶ 34. The appellate court explained that the issue of defendant's
access to the CPD file arose while the parties were litigating defendant's motion to
reconsider the dismissal of his first postconviction petition. *Id.* ¶ 35. The appellate
court, therefore, concluded that the State properly participated in those proceedings
as part of the pending litigation. *Id.* ¶ 36.

¶ 67        Turning to defendant's *Brady* claims, the appellate court first dispensed with
defendant's *Brady* claim based on the entire CPD file on the basis that defendant
did not include that claim in his proposed successive postconviction petition or in

his motion for leave to file the successive postconviction petition. *Id.* ¶ 40. Instead, the appellate court determined, defendant's *Brady* claim in those pleadings focused only on the report tendered from the CPD file, not the entirety of the file. *Id.* ¶ 41. The appellate court concluded that, "[b]ecause defendant did not raise a claim related to the entirety of the basement files in his [successive] petition, he has waived review of that claim." *Id.*[7]

¶ 68　　　With respect to defendant's *Brady* claim related to the tendered report from the CPD file, the appellate court held that defendant could not establish the prejudice prong of the cause and prejudice test for raising that claim in a successive postconviction petition. *Id.* ¶ 43. The appellate court observed that "McDonnell shed little to no light on whether defendant was involved in the murders of Villalobos and Ramirez." *Id.* Therefore, the appellate court concluded that "the impeachment evidence was not material to defendant's guilt or innocence." *Id.* ¶ 46. The appellate court, therefore, held that "the trial court properly denied defendant leave to file his successive postconviction petition." *Id.*

¶ 69　　　We granted defendant's petition for leave to appeal from the appellate court's judgment for us to review the circuit court's decision to deny defendant leave to file a successive postconviction petition. See Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

---

[7]Although not necessary for the basis on which it affirmed the circuit court, the appellate court did not mention that this claim was actually raised in count XXIII of the first amended petition, that the circuit court dismissed this claim at the second stage of the prior proceeding, that defendant did not challenge the dismissal of this claim on appeal from its dismissal, and that the appellate court affirmed the dismissal.

In this regard, we note that defendant's brief filed with the appellate court incorrectly stated that defendant made several "pre-ruling amendments to [his initial postconviction] petition" but "[n]one of these filings involved the issues raised in the instant successive postconviction petition." In its brief, the State failed to correct this misstatement of fact by noting that defendant alleged a *Brady* issue concerning the CPD file in count XXIII of defendant's first amended petition. This misunderstanding of the record continues in the present appeal, where neither party references or discusses count XXIII of defendant's first amended petition and the State incorrectly writes in its brief that defendant's first amended petition "*did not include any claim related to the Gorman letter.*" (Emphasis added.)

¶ 70                                    II. ANALYSIS

¶ 71          A proceeding under the Postconviction Act is a collateral attack on a judgment of conviction. *People v. Griffin*, 178 Ill. 2d 65, 72 (1997). Its purpose is to resolve allegations that constitutional violations occurred at trial when those allegations could not have been previously adjudicated on direct appeal. *Id.* at 72-73; *People v. Clark*, 2023 IL 127273, ¶ 38.

¶ 72          Here, defendant filed an initial petition under the Postconviction Act and vigorously litigated the 46 claims of constitutional violations that he alleged in his petition and amended petitions. The circuit court ultimately dismissed this initial postconviction proceeding at the second stage of the proceeding, and the appellate court affirmed the circuit court's judgment of dismissal. Accordingly, defendant has been afforded the protections of a jury trial, a direct appeal, a proceeding under the Postconviction Act, and an appeal from the adverse judgment in his initial postconviction proceeding. He now seeks leave to file a successive postconviction petition.

¶ 73          This court has determined that the deterrent effect of our criminal laws is undermined when criminal convictions lack finality. Therefore, we have held that the filing of a successive postconviction petition is "highly disfavored" (*People v. Simms*, 2018 IL 122378, ¶ 38) and allowed only in "very limited circumstances" (*Davis*, 2014 IL 115595, ¶ 14). See *People v. Flores*, 153 Ill. 2d 264, 274 (1992). In addition, the legislature designed the Postconviction Act with the intention that defendants be allowed to file only one petition under the statute. 725 ILCS 5/122-1(f) (West 2018); *Clark*, 2023 IL 127273, ¶ 39.

¶ 74          Under the language of the Postconviction Act, any claim of substantial denial of constitutional rights that a defendant does not raise in his original or amended postconviction petition is waived. 725 ILCS 5/122-3 (West 2018). Accordingly, in the context of a successive postconviction petition, the procedural bar of waiver is not merely a principle of judicial administration; it is an express requirement of the statute. *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002).

¶ 75                          A. The Cause and Prejudice Test for Filing a
                                    Successive Postconviction Petition

¶ 76          Nonetheless, the legislature provided a procedure in the Postconviction Act for
       filing a successive postconviction petition, but that procedure requires the
       defendant to first ask for leave of court. 725 ILCS 5/122-1(f) (West 2018) ("only
       one petition may be filed by a petitioner under this Article without leave of the
       court"). Because claims not raised in the original or amended postconviction
       petition are waived, a defendant seeking leave to file a successive postconviction
       petition must be able to demonstrate to the circuit court that there is "cause" for his
       failure to bring the claim in his initial postconviction proceedings and that
       "prejudice" results from that failure. *Id.* This cause and prejudice test is the
       analytical tool the circuit courts use to determine whether fundamental fairness
       requires an exception to section 122-3's statutory waiver. *Pitsonbarger*, 205 Ill. 2d
       at 459 (cause and prejudice test is an exception to section 122-3).

¶ 77          Except when a defendant asserts a claim of actual innocence, the Postconviction
       Act allows circuit courts to grant leave to file a successive postconviction petition
       "only" if a defendant can satisfy both prongs of this cause and prejudice test. 725
       ILCS 5/122-1(f) (West 2018); *Davis*, 2014 IL 115595, ¶ 14; *People v. Jackson*,
       2021 IL 124818, ¶ 27. "Cause" refers to some objective factor external to the
       defense that impeded counsel's efforts to raise the claim in an earlier proceeding;
       "prejudice" refers to a claimed constitutional error that so infected the entire trial
       that the resulting conviction or sentence violates due process. 725 ILCS 5/122-1(f)
       (West 2012); *Davis*, 2014 IL 115595, ¶ 14.

¶ 78          The legislature intended for the courts to make cause and prejudice
       determinations based on the pleadings and not by evidentiary hearings. *Clark*, 2023
       IL 127273, ¶ 47. The circuit courts do so by conducting a preliminary screening to
       determine whether the defendant's motion for leave to file adequately alleges facts
       that make a *prima facie* showing of cause and prejudice. *People v. Bailey*, 2017 IL
       121450, ¶ 24 ("the cause and prejudice determination is a question of law to be
       decided on the pleadings and supporting documentation submitted to the court by
       the defendant-petitioner"). Accordingly, the defendant must submit enough in the
       way of documentation to allow a circuit court to make a cause and prejudice
       determination. *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010). The State is not

allowed to participate in the court's evaluation of cause and prejudice; instead, the circuit court must make an independent determination without the State's input. *Id.*

¶ 79 When a defendant files a motion for leave to file a successive postconviction petition but fails to demonstrate a *prima facie* showing of both prongs of the test, the circuit court must deny the motion. *People v. Smith*, 2014 IL 115946, ¶ 35. Alternatively, if the circuit court determines that cause and prejudice have been adequately established, the court must grant leave to file the petition, and the petition then advances to the three-stage process for evaluating postconviction petitions. *Bailey*, 2017 IL 121450, ¶ 26.

¶ 80 Our review of the circuit court's evaluation of cause and prejudice is conducted under the *de novo* standard of review. *Clark*, 2023 IL 127273, ¶ 47. Therefore, we perform the same analysis as the circuit court, and our analysis is completely independent of the circuit court's decision. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 81 B. The Requirements of *Brady v. Maryland*

¶ 82 Here, defendant seeks leave to file a successive postconviction petition to assert a *Brady* violation claim. In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* violation claim, a defendant must establish "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. To establish materiality, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The *Brady* rule extends to favorable evidence "known only to police investigators and not to the prosecutor" trying the case. *Id.* at 438; *Beaman*, 229 Ill. 2d at 73.

¶ 83                              C. Defendant's *Brady* Violation Claim at Issue in This Appeal

¶ 84         In his appeal before the appellate court, defendant argued that he showed cause and prejudice to raise two *Brady* violation claims in a successive postconviction petition related to the CPD file: (1) a claim based on the State's failure to disclose the entire CPD file during pretrial discovery and (2) a claim based on the State's failure to disclose the police report that was tendered from the CPD file during the hearing on his motion to reconsider the dismissal of the initial postconviction proceeding.

¶ 85         On appeal before this Court, defendant has abandoned his *Brady* violation claim based on the tendered report from the CPD file as alleged in his motion for leave to file and in his proposed successive petition. Instead, defendant's argument before this court is centered entirely on a *Brady* violation claim stemming from the State's failure to disclose the entirety of the CPD file, not any specific evidence or information that is contained in the file. Defendant argues that he should be granted leave to file a successive postconviction petition because the entire CPD file was not disclosed prior to his trial in violation of *Brady* and that he should be allowed to proceed with a successive postconviction petition because the circuit court erred in allowing the State to review the CPD file and determine what should be disclosed to him from the file rather than the circuit court conducting an *in camera* inspection and making that determination without the State's input.

¶ 86         Defendant's attempt to establish cause and prejudice to assert this *Brady* violation claim fails for two alternative and fundamental reasons: (1) he did not raise the *Brady* violation claim that he now argues on appeal in his motion for leave to file or in his proposed successive petition and (2) he cannot satisfy the cause prong of the cause and prejudice test where the *Brady* claim he now argues on appeal was previously raised in the prior proceeding and adversely decided against him by a final dismissal order of the court.

¶ 87                    1. Defendant Failed to Assert a *Brady* Violation
                           Claim Concerning the Entire CPD File in
                              His Motion for Leave to File or in
                              His Proposed Successive Petition

¶ 88       The State correctly notes in its brief that it is a well-settled proposition that
postconviction petitioners may not raise claims on appeal that were not included in
their motions for leave to file or in their proposed successive petitions. See, *e.g.*,
*People v. Petrenko*, 237 Ill. 2d 490, 502 (2010) (holding that "any issues to be
reviewed must be presented *in the petition* filed in the circuit court, and a defendant
may not raise an issue for the first time while the matter is on review" (emphasis in
original)); *People v. Cathey*, 2012 IL 111746, ¶ 21 (same).

¶ 89       In *People v. Jones*, 211 Ill. 2d 140, 148 (2004), this court held that "[t]he
question raised in an appeal from an order dismissing a post-conviction petition is
whether the allegations *in the petition*, liberally construed and taken as true, are
sufficient to invoke relief under the Act" (emphasis in original). Therefore, the
*Jones* court held that any issues to be reviewed on appeal must be presented in the
petition filed in the circuit court, and a defendant may not raise an issue for the first
time while the matter is on review. *Id.*

¶ 90       This basic principle is especially true on appeal from the denial of leave to file
a successive postconviction petition, where the standard for filing is higher than the
standard for filing an initial postconviction petition. See *Smith*, 2014 IL 115946,
¶ 35 (the cause and prejudice test for a successive petition involves a higher
standard than the first-stage frivolous or patently without merit standard that is set
forth in section 122-2.1(a)(2) of the Postconviction Act).

¶ 91       In the appeal below, the appellate court correctly applied this fundamental
principle and rejected defendant's *Brady* claim based on the entire CPD file because
that claim was raised for the first time on appeal. The appellate court carefully
reviewed defendant's *pro se* pleadings seeking leave to file a successive
postconviction petition and correctly concluded that defendant did not include this
*Brady* violation claim in his motion or in his proposed successive petition.

¶ 92       After a thorough review of the record, we reach the same conclusion. The
appellate court accurately described the claims defendant raised in his motion and

proposed successive petition and correctly concluded that he did not include any *Brady* violation claim based on the entirety of the CPD file. Nowhere in his motion for leave to file or in his proposed successive petition does defendant make a *Brady* violation claim based on the entirety of the CPD file, nor does he discuss the requirements of establishing a *Brady* violation due to the State's nondisclosure of the entire CPD file.

¶ 93    Instead, defendant's pleadings focus exclusively on the police report tendered to him from the CPD file, explaining, in detail, the police report's significance with respect to impeachment evidence. His proposed successive petition includes 10 pages of allegations and analysis concerning the report that was contained within the CPD file. He sets out the requirements of *Brady* and explains how the nondisclosure of the report contained within the CPD file satisfies *Brady*'s requirements. His motion for leave to file and his successive petition do not offer any similar discussion or analysis of *Brady* as it relates to the entirety of the CPD file.

¶ 94    For example, defendant attempts to satisfy the "cause" prong of the cause and prejudice test by referring exclusively to the tendered report. He alleged that (1) on May 2, 2018, he informed the circuit court of his efforts to secure the CPD's file in the possession of Gorman but his efforts failed due to his *pro se* status, (2) that the assistant state's attorney subsequently provided him with a 2002 report from that file, and (3) that he "*did not have this police report at trial or in his initial post-conviction* (before August 29, 2017)" and, therefore, was unaware of his *Brady* claim. (Emphasis added.) This assertion of cause cannot be in reference to the entire CPD file when defendant was aware of a potential *Brady* claim due to its nondisclosure as early as April 2016. Accordingly, his effort to establish "cause" in his motion for leave to file concerns only the report, not the entire CPD file.

¶ 95    Likewise, in the motion for leave to file, to establish the "prejudice" prong of the cause and prejudice test, defendant alleged (1) that *the police report* was favorable to his defense, (2) that it was suppressed by the State or agents of the State, and (3) "that the favorable and suppressed evidence was material, in that there is a reasonable probability that it would have changed the outcome of [defendant's] trial." The entirety of defendant's prejudice analysis focuses

exclusively on the report tendered from the CPD file, with no mention of prejudice relating to the entire CPD file.

¶ 96   Also, in his proposed successive petition, defendant specifically defined the *Brady* issue he wanted to raise as follows: "The State *failed to turn over a police report* which would have affected the credibility of multiple witnesses for the State in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)." (Emphasis added.) Like his motion for leave to file, the allegations in the proposed successive petition focus entirely on "the withheld August 28, 2002, police report" that was not tendered to defendant in pretrial discovery.

¶ 97   In his proposed successive petition, defendant alleged and explained how the nondisclosure of the *police report* resulted in "lost impeachment opportunity." Defendant also argued that the State's failure to disclose the police report was cumulative to its *Brady* violation with respect to Ortiz's plea agreement (the claim that was rejected by the circuit court and appellate court during the prior postconviction proceeding). In arguing the cumulative effect of the nondisclosure of the police report and the nondisclosure of information regarding Ortiz's plea, defendant emphasized that his discovery of Ortiz's plea deal was first made during his postconviction proceeding and that "[n]ow documents from over (17) years ago, hidden in file cabinets by agents of the State are unearthed."

¶ 98   Defendant urges us to consider this last sentence of his "cumulative effect" argument as his attempt to raise a *Brady* violation claim with respect to the entire CPD file. However, like the appellate court, we are not convinced. Defendant added this sentence to emphasize the *timing* of his discovery of *the report* in the CPD file, not to raise a separate *Brady* claim with respect to the CPD file. The appellate court succinctly noted this fact as follows:

> "This statement is clearly a reference to the police report because the report is the subject of the entirety of defendant's first claim. The statement is not a reference to the entirety of the [CPD file] because defendant does not otherwise discuss the entirety of the files or claim error in the trial court's discovery-related rulings regarding the [CPD file]. Because defendant did not raise a claim related to the entirety of the [CPD file] in his petition, he has waived review of that claim." 2022 IL App (1st) 191930, ¶ 41.

¶ 99    Although defendant filed his motion for leave to file his proposed successive petition *pro se*, his *pro se* status is not a basis to allow him to introduce new claims in an appeal from the denial of leave to file the successive postconviction petition. See *Petrenko*, 237 Ill. 2d at 502-03; *People v. Mars*, 2012 IL App (2d) 110695, ¶ 33.

¶ 100    In *Mars*, the appellate court noted that the *pro se* defendant in that case "was aware of legal concepts, such as a *Brady* violation, and he was capable of articulating the type of relief he thought he was entitled to." *Mars*, 2012 IL App (2d) 110695, ¶ 33. In reaching this conclusion, the appellate court also noted that the defendant's *pro se* petition was an organized and coherent document with appropriate citations and specific legal challenges. *Id.* These observations have particular relevance in the present case where the record demonstrates that defendant is profoundly aware of *Brady* as a legal concept and is adept at drafting coherent *pro se* pleadings supported with citations, logical argument, and explicitly identified legal issues. We have no reason to believe that defendant suddenly lost his ability to plead clearly defined legal issues when he prepared his *pro se* motion for leave to file a successive postconviction petition.

¶ 101                    2. *Res Judicata*

¶ 102    In addition to failing to raise a *Brady* violation claim based on the entirety of the CPD file in his proposed successive petition, defendant's attempt to raise this claim in this appeal also fails for another separate and fundamental reason; the claim is barred by *res judicata*.

¶ 103    The doctrine of *res judicata* bars consideration of issues that were previously raised and definitively settled by judicial decision. *People v. Blair*, 215 Ill. 2d 427, 443 (2005). Here, in defendant's initial postconviction proceeding, his first amended petition included count XXIII, which was the same *Brady* violation claim, with respect to the entire CPD file, that defendant now argues is justification for filing a successive postconviction petition. Specifically, defendant set out count XXIII as a *Brady* violation claim due to the nondisclosure of the entire CPD file, and for the "factual basis" of this claim, defendant alleged, "See letter from H. Candace Gorman dated December 5, 2015, as is attached hereto." Defendant filed count XXIII in April 2016 as part of the prior proceeding.

¶ 104     The circuit court dismissed this claim, along with the other claims, at the second stage of the prior proceeding. The appellate court affirmed this dismissal. Accordingly, further litigation on the claim alleged in count XXIII is barred by the *res judicata* doctrine. *People v. Gosier*, 205 Ill. 2d 198, 203 (2001) (the doctrine of *res judicata* applies such that " 'a ruling on a post-conviction petition has *res judicata* effect with respect to *all claims that were raised*' " (emphasis added) (quoting *People v. Free*, 122 Ill. 2d 367, 376 (1988))); see also *Pitsonbarger*, 205 Ill. 2d at 455-56 (*res judicata* and the doctrine of waiver limit postconviction relief to constitutional claims that have not been and could not have been raised earlier).

¶ 105     Principles of fundamental fairness allow courts to relax the effect of the *res judicata* doctrine. *Clark*, 2023 IL 127273, ¶ 45. However, in proceedings under the Postconviction Act, fundamental fairness for relaxing the doctrine is established only by satisfying the requirements of the cause and prejudice test. *Id.* Therefore, defendant must be able to satisfy the cause prong of the cause and prejudice test, *i.e.*, establish the existence of an objective factor, "external to the defense," which "*impeded the defendant's ability to raise a specific claim at the initial postconviction proceeding*." (Emphasis added.) *Id.* ¶ 60.

¶ 106     Defendant cannot satisfy the cause prong of the test when he did, in fact, raise the specific claim he seeks to raise again in his successive petition. "There can be no cause for failing to raise a claim in the initial proceeding when the claim was, in fact, raised in that proceeding." *People v. Conway*, 2019 IL App (2d) 170196, ¶ 25; see also *People v. English*, 403 Ill. App. 3d 121, 131 (2010) (reviewing court determined that *res judicata* prevented the petitioner from establishing "cause" for a successive postconviction petition when his ineffective assistance of counsel claim was the same as the claim in his initial petition, despite his successive petition including new affidavits supporting the claim).

¶ 107     A defendant typically invokes the cause and prejudice test to excuse his *failure* to raise an issue in his initial postconviction proceeding where some objective factor "external to the defense" prevented the claim from being raised in the initial proceeding. *People v. Jones*, 191 Ill. 2d 194, 199 (2000) ("claims in a successive post-conviction petition are barred unless the defendant can establish good cause for *failing to raise* his claims in prior proceedings" (emphasis added)). The cause and prejudice test set out in the Postconviction Act specifically states that the test

is for allowing defendants to raise issues that were not raised in the initial postconviction proceedings. 725 ILCS 5/122(f) (West 2018) ("demonstrates cause for his or her *failure to bring the claim in his or her initial post-conviction proceedings*" (emphasis added)). Here, defendant seeks to invoke the cause and prejudice test to reraise an issue that was raised in the initial postconviction proceeding but adversely decided against him by a final order of the court.

¶ 108 Defendant argues that it is unfair to deny him leave to file a successive petition because he is merely seeking "access to his file" to determine if it contains *Brady* material. In doing so, he complains about the procedure used by the circuit court in allowing the State to review the CPD file and determine what to provide him from the file. However, the procedure the circuit court used to review the CPD file stems from proceedings that took place in the initial postconviction proceeding and, more specifically, proceedings that occurred in hearings on defendant's motion to reconsider the dismissal of his postconviction claims, including the dismissal of count XXIII pertaining to this issue. The opportunity to challenge that procedure was in his appeal from the dismissal of count XXIII, not in an appeal from the denial of leave to file a successive postconviction petition seeking to raise the claim a second time. As stated at the outset of our analysis, successive postconviction petitions are disfavored; they are not procedural vehicles for piecemeal discovery and litigation. *Davis*, 2014 IL 115595, ¶ 55 ("A defendant is not permitted to develop the evidentiary basis for a claim in a piecemeal fashion in successive postconviction petitions ***.").

¶ 109                     3. Defendant's *Pro Se* Status in the
                        Prior Proceeding Is Not Cause for
                     Filing a Successive Postconviction Petition

¶ 110 Defendant suggests that his *pro se* status in the prior proceeding constitutes cause for bringing his *Brady* violation claim with respect to the entire CPD file a second time in a successive petition. In support of this argument, he asserts in his brief that his affidavit attached to his motion for leave to file a successive postconviction petition establishes that "[o]nce alerted to the existence of [the CPD file] related to his case, [defendant] attempted to obtain the file from Gorman" but his *pro se* status prevented him from gaining access to the CPD file. The State tells

us in its brief that defendant did not add a claim about the CPD file to his initial petition, and in his reply brief, defendant answers this assertion with the equally inaccurate assertion that defendant did not do so because he "was attempting to obtain the [CPD file] prior to adding a claim about it to his initial petition."

¶ 111    Neither party mentions count XXIII of the first amended petition in which defendant alleged a *Brady v*iolation and referenced Gorman's December 3, 2015, letter as the factual basis for the claim. As stated, he filed count XXIII in April 2016. The record does not reflect *any* further action by defendant whatsoever with respect to the CPD file until *after* the dismissal of count XXIII when he then filed an ARDC complaint against Gorman in February 2018.

¶ 112    Defendant cannot convincingly assert that his *pro se* status was an objective factor outside his defense that inhibited his ability to raise a *Brady* violation claim with respect to the entire CPD file when he raised the claim in count XXIII and then made no effort to access the CPD file prior to the dismissal of count XXIII. Defendant could have filed a discovery request prior to dismissal of count XXIII, as he did with respect to the *Brady* issue alleged in count XIX, rather than waiting until a hearing on his motion to reconsider the dismissal of the initial postconviction proceeding to ask for discovery. See, *e.g.*, *People v. Jakes*, 2013 IL App (1st) 113057, ¶¶ 25-29 (permitting postconviction discovery at second stage); *People v. Fair*, 193 Ill. 2d 256, 264-65 (2000) (trial court's denial of postconviction discovery at second stage was error where defendant showed " 'good cause' "); *People v. Howery*, 2019 IL App (3d) 160603, ¶ 19 ("it is clear that postconviction discovery is allowed while a postconviction petition remains pending").

¶ 113    Although defendant argues that his *pro se* status prevented him from accessing the CPD file due to the federal protective order, his *pro se* status did not prevent the circuit court from accessing the CPD file by issuing a subpoena for purposes of the second-stage proceedings on count XXIII. In fact, that is exactly what the circuit court did once defendant finally asked the circuit court for access to the CPD file years after he became aware of the CPD file's existence but also after the circuit court had dismissed claim XXIII. In addition, defendant could have argued on appeal that from the dismissal of count XXIII that the claim should not have been dismissed prior to his gaining access to the CPD file. Nothing about defendant's

*pro se* status prevented him from presenting this claim in the prior proceeding before the circuit court and on appeal.

¶ 114    Defendant's failure to pursue his *Brady* claim based on the CPD file is in sharp contrast to defendant's vigorous second-stage discovery and litigation of his *Brady* violation claim with respect to Ortiz's plea agreement. In pursuing his *Brady* violation claim with respect to the Ortiz plea agreement, defendant exhibited his ability to file pleadings requesting access to documents, evidence, and information in support of a *Brady* violation claim and demonstrated the ability to put the *Brady* issue before the court, front and center, prior to the court ruling on the State's motion to dismiss. He raised a specific *Brady* claim with respect to the entire CPD file in April 2016, but he chose not to pursue that claim with the same aggressiveness that he did with respect to the *Brady* claim based on Ortiz's plea agreement, although he raised both claims in the same proceeding. This was a product of defendant's own strategy decisions, choosing to focus his efforts on Ortiz's plea agreement, not an objective factor outside of his defense that inhibited his ability to also vigorously pursue the claim alleged in count XXIII.

¶ 115    A reversal of the circuit court's denial of leave to file a successive postconviction petition under the facts of this case would require us to suspend the application of the cause and prejudice test for defendant so he can raise the same claim anew, although he lacks cause to do so. The Postconviction Act is a statutory remedy, and there is no language in section 122(f) that authorizes courts to disregard the cause prong of the cause and prejudice test for defendants who elect to proceed *pro se* during the second stage of their initial postconviction proceeding, are not satisfied with the results of the initial proceeding based on the choices they made in presenting the claims, and want a second chance at raising the same claims again. The cause and prejudice test does not allow us to permit defendant to proceed in such a piecemeal fashion.

¶ 116    Defendant argues that the circuit court's procedure in this case is a departure from other First District cases where nearly identical claims were automatically "advanced" based on the reasoning that the litigants needed access to their CPD files.

¶ 117 In support of this assertion, defendant directs our attention to three cases: *People v. Banks*, 2020 IL App (1st) 180322-U,[8] *People v. Lyles*, 2022 IL App (1st) 201106-U, and *People v. Fallon*, No. 1-21-1235 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)). None of these cases support defendant's claim of cause for filing a successive postconviction petition.

¶ 118 In *Banks* and *Fallon*, the appellate court considered the issue in the context of an *initial* postconviction petition, which does not involve application of the cause and prejudice test. *Banks*, 2020 IL App (1st) 180322-U ¶¶ 7, 13; *Fallon*, No. 1-21-1235. *Banks* and *Fallon* actually support a finding of a lack of cause for filing a successive postconviction petition where defendant could have raised this argument on appeal from the dismissal of count XXIII in the prior proceeding.

¶ 119 In *Lyles*, the defendant demonstrated cause because his initial postconviction petition proceeding ended in 2011, prior to the discovery of CPD files related to his case, so he could not raise the claims related to a similar letter he received from Gorman in 2015. *Lyles*, 2022 IL App (1st) 201106-U, ¶¶ 5-7, 16. Here, defendant received his letter from Gorman while his initial postconviction petition was pending, and he amended his postconviction petition to expressly raise a *Brady* violation stemming from the State's failure to tender the file referred to in Gorman's letter. Neither *Banks*, *Lyles*, nor *Fallon* offers any support for defendant's request for leave to file his proposed successive postconviction petition.

¶ 120 Because defendant cannot establish cause for filing a successive postconviction petition, we need not consider the prejudice prong of the cause and prejudice test. *Smith*, 2014 IL 115946, ¶ 37 ("Having concluded that defendant cannot show prejudice, we need not address defendant's claim of cause.").

¶ 121 III. CONCLUSION

¶ 122 Successive postconviction petitions impede the finality of criminal litigation. Therefore, a defendant faces immense procedural default hurdles when seeking to

---

[8]Defendant's citation of *Banks* and *Fallon* is at odds with Illinois Supreme Court Rule 23(e) (eff. Feb. 1, 2023), as *Banks* was filed prior to 2021 and *Fallon* is a summary order filed under Rule 23(c). We overlook that, as *Banks* and *Fallon* are not helpful to defendant, as we detail below.

file a successive petition. *Davis*, 2014 IL 115595, ¶ 14. The hurdles are lowered only in "very limited circumstances" (*id.*) and in an "extremely narrow class of cases" (*Jones*, 191 Ill. 2d at 199).

¶ 123    Here, the *Brady* issue that defendant seeks to raise in a successive petition was not raised in his motion for leave to file a successive postconviction petition, and in addition, the issue was previously raised in his initial postconviction proceeding and judicially decided by the entry of a final dismissal order. Defendant's motion for leave to file a successive postconviction petition falls short of demonstrating that the procedural hurdles for filing a successive petition should be lowered in this case. The circuit court ruled correctly in denying defendant leave to file a successive postcondition petition, and we therefore affirm the appellate court, which affirmed the circuit court's judgment.

¶ 124    Judgments affirmed.

¶ 125    JUSTICE ROCHFORD took no part in the consideration or decision of this case.