2024 IL App (1st) 200456-U

No. 1-20-0456

Order filed June 5, 2024

THIRD DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | No. 16 CR 08715 (02) |
| v. | ) ) | Honorable Thaddeus L. Wilson |
| DWRIGHT DOTY, | ) ) | Judge, Presiding |
| Defendant-Appellant. | ) ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court did not abuse its discretion in denying defendant's motion for continuance, in denying defendant's motion for a mistrial, or in determining defendant's sentence.

¶ 2     Defendant Dwright Doty appeals his conviction and sentence for first-degree murder. Defendant was charged, along with co-defendants Corey Morgan (Corey) and Kevin Edwards (Edwards), with first-degree murder for the November 2, 2015 murder of nine-year-old Tyshawn Lee. Edwards pleaded guilty and defendant and Corey proceeded to joint, but

severed, jury trials. Following his jury trial, defendant was found guilty and sentenced to 90 years' imprisonment. On appeal, defendant argues that the circuit court erred in denying one of his motions for continuance and in denying his motion for a mistrial after a discovery violation on the part of the State. Further, defendant argues that the circuit court considered improper factors in sentencing and relied improperly on its own private knowledge in determining his sentence. We affirm the circuit court's decision and sentence.

¶ 3                                    I. BACKGROUND

¶ 4        On November 2, 2015, nine-year-old Tyshawn Lee was shot to death in an alley adjacent to Dawes Park, near the intersection of S. Damen Avenue and W. 80th Place. The State sought to establish that defendant was the shooter.

¶ 5                                 A. Motion for Continuance

¶ 6        Defendant was charged in June 2016 and appointed counsel. A number of different public defenders worked on defendant's case between June 2016 and the start of trial. The attorney who took the lead at trial, Public Defender Danita Ivory, filed her first appearance in the case on July 18, 2018. She argued numerous motions on defendant's behalf prior to trial. The first trial date of April 22, 2019 was set on December 12, 2018. On March 8, 2019, the start date for the trial was moved to September 9, 2019.

¶ 7        The final pre-trial conference was held August 26, 2019. At the start of that conference, Ivory notified the court that her client had, that morning, expressed a wish to proceed *pro se*. Defendant stated that he had no problem with the attorneys representing him, but he thought it was in his best interest to represent himself. The circuit court questioned defendant as to his educational background and his understanding of the law. The circuit court verified with defendant that he knew that his decision to represent himself would not delay the trial and

they would still proceed on the planned trial date. In the process of describing the potential

concerns around self-representation to defendant at length, the circuit court engaged in the

following exchange with him:

> "COURT: A defendant representing himself will receive no extra time for
> preparation. Do you understand that?
>
> DEFENDANT: No.
>
> * * *
>
> COURT: We're going to trial. We're going to start on the same schedule we have.
> There will be no delay. I know some defendants in jail think they're going to get a
> delay. Not going to happen. There is no delay. Do you understand that?
>
> DEFENDANT: Yes, sir.
>
> COURT: A defendant representing himself will receive no extra or greater library
> time if in jail or prison. Do you understand that?
>
> DEFENDANT: Yes, sir.
>
> COURT: Whatever the schedule the jail has for you, that's the schedule. You'll get
> no extra time. Do you understand that?
>
> DEFENDANT: Yes, sir."

¶ 8        Following that exchange, the court found that defendant had not made a voluntary,

knowing, and intelligent waiver of his right to counsel and that the request was a "ploy for a

delay." The court stated that even though defendant was fit to stand trial, it did not believe

that he was "capable of representing [himself] in a trial of this magnitude without significant

and substantial delay." Defense counsel asserted that the standard for self-representation was

no higher than that of competency to stand trial, so he had the right regardless of whether he

would serve as a competent attorney. The circuit court reiterated that it found his request to be a delay tactic and that the request was denied.

¶ 9    The circuit court held a hearing on August 30, 2019 for the expressed purpose of further addressing defendant's wish to represent himself. The court again reiterated that there would be no delay and admonished defendant regarding the difficulty of being prepared for a month-long trial in such a short time, in addition to continuing to be ready day after day for what the court expected to be a month-long trial. Defendant confirmed that he understood there would be no more continuances and that he still wished to represent himself. The court granted his request to proceed *pro se* and appointed his defense counsel as standby counsel over Ivory's objection.

¶ 10    After some discussion of what would be involved in tendering discovery to defendant, as well as the difficulties in doing so in a timely fashion in the week or so before trial, the State asserted that it would be impossible for defendant to go through the voluminous discovery prior to trial. The State proposed that if defendant was ready for trial, there was no need to tender discovery; however, if defendant was not ready for trial, the circuit court should deny the motion to proceed *pro se*, as he could not be ready in time for trial. The circuit court noted that the decision to allow defendant to proceed *pro se* was not final and, if it became evident that defendant was not ready, the court could reappoint counsel. The circuit court then had the following dialogue with defendant:

"COURT: [Defendant], you're ready for trial, is that correct?

DEFENDANT: I got to look through my discovery, Your Honor.

COURT: What does that mean?

DEFENDANT: He's saying he can't. You're trying to make him – force him to get what he can. I need all my discovery. I don't need just what he can.

COURT: No, you said you're ready for trial. See, remember I went through all that stuff in that book and process on that sheet? It's a reason. Because the Supreme Court says I need to do these steps and make sure I get all these things to make sure it's clear that you know that on the eve of trial you asked to represent yourself, you're going to trial, you're saying that you're ready as is, and so if you are ready you're ready with whatever you have.

Now, I'm going to put it on the State to try to get as much as they can extra and Defense with those matters that are not redacted who are standby to work with you but there will be no delay, and so if you are not ready then it is clear to me that it's for the purpose of delay and you will not be able to represent yourself. So which is it? You're ready or you're not? Are you ready for trial?

DEFENDANT: Like I told you Monday, I'm going to try my best to be ready. As soon as they get the discovery to me as soon as I can prep myself to be ready for trial.

COURT: Are you ready for trial?

DEFENDANT: I can't say I'm ready right now, no. I ain't seen none of my discovery.

COURT: Well then, you can't represent yourself.

DEFENDANT: How come I can't?

COURT: Because you're not ready. We're on the eve of trial. As the case law says the Court is not obligated to give you a continuance for a request to represent yourself *pro se* on the eve of trial nor am I required to give you additional time to prepare.

5

You want to represent yourself on the eve of trial then you're saying you're ready. That's the law. So you ready for trial as is?"

¶ 11     The circuit court noted that defendant had four years of incarceration to decide how to go about his defense and the State interjected that there had been 50 previous court appearances prior to the day defendant decided to request to represent himself. The circuit court emphasized that despite those facts, he waited until within two weeks of trial to request to represent himself. The following exchange then occurred:

"COURT: I'll pass this matter momentarily for defendant to consider—

DEFENDANT: I'm ready.

COURT: So you're ready for trial?

DEFENDANT: Yes.

COURT: As is. Whatever you have and whatever they can get to you we will endeavor, but you're ready.

DEFENDANT: Yes, sir.

\*\*\*

COURT: He's ready for trial. We'll endeavor to get him whatever we can."

¶ 12     At the following court date on September 3, 2019, defendant reaffirmed that he still wished to represent himself. When asked if he was aware that co-defendant Edwards had pled guilty, defendant replied: "Yes, sir." The court reiterated that trial was to begin September 10, 2019, and this exchange followed:

"COURT: Are you ready for trial?

DEFENDANT: I'm getting ready now.

COURT: Alright. Give me one second.

6

(A brief pause.)

COURT: You should really reconsider this decision. You represent yourself now so if you wish to discuss with the State the possibility of a plea offer, then you need to alert them let them know."

¶ 13    At a hearing on the following day, September 4, 2019, the circuit court moved the date for selecting the jury to September 13, 2019 to give defendant a few extra days to prepare, with opening statements and testimony to start on September 17, 2019. Defendant twice reaffirmed his wish to continue representing himself at the next hearing on September 9, 2019. During that hearing, the following exchange occurred:

"COURT: Are you ready for trial?

DEFENDANT: No, sir, Your Honor.

COURT: You're not going to be ready for trial?

DEFENDANT: I ain't ready as of this moment but –

COURT: What does that mean? We're going to be picking your jury on Friday.

* * *

DEFENDANT: I will be able to let you know for sure. He just tendered over some more evidence. So I ain't got a chance to look through that yet.

COURT: I told you there would be no delays. So if you're not ready then I will have the Public Defenders back on the case to represent you."

Discussion then turned to discovery matters and never returned to the issue of whether defendant was ready for trial.

¶ 14    On September 10, 2019, defendant again confirmed that he wished to continue representing himself and the State requested that the court inquire as to his readiness. The following discussion ensued:

"COURT: Are you ready for trial?

DEFENDANT: No sir, I ain't – no, I ain't ready. No, I ain't ready. I don't even know no proper way to pick my jury yet. I've been going over this, looking at the jury thing. I'm just –

COURT: Well, then I'll appoint the team back – the public defender team back, to take over representation on this case. I'll wait until tomorrow to deal with that. Counsel, you should probably have your team on the ready to take back over this [*sic*], because there will be no delay.

DEFENDANT: Yes, sir."

¶ 15    On the following day, September 11, 2019, defendant again asserted that he wished to continue to represent himself. The court gave defendant further instruction on the process of picking a jury. On September 12, 2019, defendant yet again reiterated that he wished to proceed *pro se* and asked for a continuance for the purpose of reviewing discovery. The following exchange occurred:

"COURT: Well, you were advised of that, that there would be no delays. You're the one who decided on the eve of trial you wanted to represent yourself. This matter had even been set for trial months ago, when the court continued the matter for everyone to [be] prepared to do other pretrial motions. Additionally, we went through all of the discovery with your attorneys in preparation for this trial, before you decided to go *pro se*. Your oral motion for a continuance is denied.

DEFENDANT: I'm not ready to pick a jury tomorrow for trial. So how we gonna go about it?

COURT: Well, you'll have to figure that out. You'll have the assistance of standby counsel to assist you with that, if you choose to utilize their services, but we will be picking a jury tomorrow morning. I have given you the process sheet for how that's done, and I warned you of this when you decided to go *pro se*."

After other issues were discussed, defendant returned to the subject:

"DEFENDANT: I'm saying, like, basically you gonna force me to trial without learning all my discovery and without tendering everything to me. Can you appoint my lawyer back then? Cause it's no way possible I can be ready by tomorrow, with them giving me discovery today, too, and tomorrow.

COURT: The public defender is re-appointed."

¶ 16     Upon reappointment, defense counsel moved for a continuance. Defense counsel explained that defendant had been persistent in his desire to represent himself, had opposed the appointment of standby counsel, and had not made any requests of his standby counsel or met with his standby counsel at all as attorney and client during the three weeks that he had been representing himself. Defense counsel stated that some defense witnesses had not been located because the investigators stopped looking once defendant began representing himself. Further, defense counsel had planned to have an expert witness present, but it would be very unlikely that they would be able to have them present on such short notice after being reappointed the day before jury selection was to begin. Lastly, two non-lead members of the four-member defense team would not be able to be present. Defense counsel requested a continuance to September 30, 2019. The State declined to take a position because, it stated, it

thought that was "the Court's bailiwick," but it did note that it had incurred significant effort and expense arranging for out of state witnesses and one international witness to be present for trial as scheduled. The circuit court denied the motion. The court stated: "The defendant orchestrated this situation and, as far as the Court is concerned, it was orchestrated for the intended or attempted purpose of delay."

¶ 17        On the day of jury selection, September 13, 2019, defense counsel renewed defendant's motion for continuance and answered not ready for trial. Defense counsel noted that the State had made available one of the three witnesses counsel was still attempting to contact. After some discussion, it was ascertained that the State could bring both of the remaining witnesses sought by defendant to court on the following date to be made available to the defense. At that point, the defense reiterated the remaining issue and the court ruled:

> "DEFENSE COUNSEL: If those witnesses are made available prior to opening statements, that cures one issue. We still have the issue of the delay between when [defendant] goes *pro se* and when our office, on the eve of trial, is reappointed.
>
> COURT: I reviewed the motion, heard the arguments, reviewed the case law. The defendant created and, as I said, orchestrated this situation.
>
>     As I said originally, I thought that the purpose was for delay, and while I ultimately had felt duty bound to relent and allow him to represent himself, even though I was thoroughly convinced the purpose was to create some delay or appellate issues, the defendant created this situation. The defendant orchestrated this situation.
>
>     Counsel were here every day. We had them available to him, and the motion and the renewed motion to continue trial is denied."

¶ 18        Defendant's written renewed motion for continuance echoed the same arguments expressed in court and additionally argued that if the court refused to grant a continuance, defendant would be denied his constitutional right to a fair trial, as he needed more time to discuss trial strategies and locate and interview witnesses.

¶ 19                                            B. Trial Testimony

¶ 20        The State sought and was granted leave to present gang evidence to contextualize their case against defendant. Officer Matthew Kennedy, an expert on the gangs of the southwest side of Chicago, testified that at the time of the shooting, there was an ongoing feud between the Killa Ward (KW) gang, which was a faction of the Gangster Disciples, and the Terror Dome/Bang Bang Gang (TD/BBG), which was a faction of the Black P Stones. On October 13, 2015, Tracey Morgan and his mother were shot. Tracey was a well-known member of TD/BBG and was co-defendant Corey Morgan's brother. Tracey died. His mother survived. Two members of KW were charged with his murder. Officer Kennedy explained that one of the common rules among gangs in the area was that "violence shouldn't be brought upon innocent victims of family members."

¶ 21        Officer Kennedy expected TD/BBG would retaliate because Morgan's mother's shooting broke that rule. Officer Kennedy requested that the FBI conduct an investigation of the social media posts of both TD/BBG and KW. Among the photos Officer Kennedy received from this investigation were photos of defendant and his co-defendant Corey Morgan displaying the gang sign of TD/BBG. Also among the photos were images of Pierre Stokes, who is the father of the victim, displaying the gang sign of KW alongside two men who were charged with Tracey Morgan's murder sometime after the victim's murder.

¶ 22    Multiple witnesses testified that the victim, Tyshawn Lee, lived near Dawes Park and that he was in the park just before the shooting. Three men in their twenties, who were notably older than the high-schoolers present in the park that afternoon, were seen in the park, as well as entering and exiting a black SUV parked next to the park. One of the men, who a witness identified as defendant, was described as an African American man no more than six feet tall with a little bit of facial hair, wearing a red and blue striped jacket and Rock Revival brand jeans. Other witnesses, who knew defendant, stated that defendant wore Rock Revival jeans every day. Defendant stayed in the park while the other two men returned to the SUV. Defendant then approached the victim, who had set down a basketball to play on a climbing apparatus. Defendant picked up and dribbled the ball while speaking to the victim. Defendant then walked out of the park, with the victim, to a nearby alley. Multiple gunshots were heard from the alley, the black SUV was seen driving away from the scene of the shooting, and the victim was discovered shot to death.

¶ 23    Two witnesses described the individual alleged to be defendant similarly, but the only witness to identify him in a photo array, Jaylen Anderson, failed to appear when subpoenaed and testified while in custody. Anderson testified that he was not a gang member at the time of the shooting, but had since become a member of the Gangster Disciples. Three other witnesses described one or more of the three men in less detail.

¶ 24    Two other witnesses, Devontay Gary and Moesha Walker, were both siblings of co-defendant Edwards and lived with him during a period of time including October and November 2015. Both testified that defendant and his co-defendants were close friends and would frequently be present in the house. Walker further testified that on October 14, 2015, during the conversation with Corey and Edwards in which she learned that Tracey had been

killed and his mother shot, Corey said "n***s tweak. Everybody must die, grandmamas, kids, and all," which Walker understood to mean that he intended retaliation. Corey and Edwards agreed that KW was responsible for the shooting.

¶ 25    Both Gary and Walker testified that Edwards began driving a black SUV a month or so before the shooting and that he ceased driving it shortly after the shooting. The black SUV matched the description of the vehicle seen fleeing the scene of the shooting. Additional testimony established that a black SUV with a license plate matching the SUV driven by Edwards had been missing from the lot of the rental company that owned it during the time Edwards was driving it; that the vehicle was driven from the home of Robin Mathews, Corey's girlfriend at the time, who was also known as Millie, to the scene of the shooting and was present in the area at the time of the shooting, after which it was driven back to Millie's home; and that the vehicle was abandoned in Dolton, Illinois after the shooting. Antwan Davis, who lived with Corey's girlfriend at the time of the shooting, testified as to defendant and his co-defendants being present in the home on the morning of the shooting, leaving before lunch, and returning around dusk. Davis described the three as wearing clothes that day that matched other witnesses' descriptions of the individuals in the park. Davis recognized the recovered black SUV as the one that was driven by Edwards during the time Davis was living with Corey's girlfriend.

¶ 26    Collected DNA samples returned results showing mixed DNA, but strongly indicated that defendant contributed to the profile collected from the front driver's door, steering wheel, and rear passenger overhead assist handle of the black Ford Edge. The collected samples also "strongly" and "very strongly" indicated that he contributed to a sample from the basketball recovered from the site of the shooting. Per the expert witness, Dr. John Buckleton, the DNA

evidence collected that was least strongly connected to defendant was still one trillion times more likely to have been left behind in a scenario where defendant contributed his DNA to the sample than in a scenario in which he had not.

¶ 27    Detective Jeff Rodenberg testified that on November 16, 2015, an anonymous tip prompted him to set up surveillance on the Hilton Hotel in Oak Lawn. Detective Rodenberg observed defendant leaving the hotel with Corey. Corey was carrying a duffel bag. Defendant and Corey got in a Chrysler and exited the hotel parking lot. Rodenberg and his partner stopped and searched the car. Rodenberg found a loaded handgun in the duffel bag. Defendant and Corey were both taken into custody, but were not yet charged in relation to the victim's killing.

¶ 28    Detective Timothy Murphy testified that, in January 2016, he learned from Investigator Domma at the Cook County Jail that an inmate named Demetrius Murry had information related to the shooting. In an interview with Detective Murphy and an assistant state's attorney, Murry signed a cooperation agreement and agreed to wear a recording device during conversations with defendant, who had been jailed on an unrelated matter. Murry was provided with a "thumb drive recording device" that he could activate and hide on his person. Murry recorded conversations between himself and defendant. After sending the recordings to have background noise removed, Detective Murphy listened to the recordings with Murry and asked him for context on the conversations and for explanations of what he understood to be meant by certain statements.

¶ 29    Murry testified that he was, at the time of trial, serving a ten and a half year sentence for aggravated discharge of a firearm and a three year sentence for unlawful use of a weapon by a felon. In November 2015, Murry was awaiting trial in Cook County Jail for the

aforementioned charges. Around this time, he met defendant and began to talk to him "[a]lmost like every day." Murry was the number two ranking member of the Sircon City faction of the Gangster Disciples gang and became aware that defendant was a Black P Stone, but he testified that there were no issues between their respective groups. During the time when Murry was getting to know defendant, defendant was talking "every day all day" about a case on the news in which he said he was the culprit for whom the police were looking. Defendant told Murry that he shot the victim in retaliation because his "brother" had been killed and his "mother" shot. Murry stated that defendant performed a rap song about the victim's shooting while Murry was recording.

¶ 30       Murry attributed his decision to speak with Investigator Domma to a combination of self-interest and distaste for defendant's actions. Murry confirmed that he recorded conversations, turned over the device for downloading, and listened to selected portions of the discussions with Detective Murphy while reading through the transcript for those recordings. Murry testified at length about his interpretations of various statements made by defendant in the recordings, most notably that defendant stated that he had gone to the park with his codefendants, that he had shot and killed the victim, and that they had used a "2015 Ford truck" to get to and from the scene of the crime. Defendant also made reference in the recordings to getting on the expressway after the shooting and calling Millie.

¶ 31       Officer Eulalio Rodriguez testified that on the night of April 21, 2017, he and two other officers came across what appeared to be a music video being recorded in a vacant lot between 71st St. and 70th St. off of Wolcott St. The vacant lot had about 30 to 50 people gathered in and around it, who scattered upon seeing the unmarked police SUV that Officer Rodriguez was driving. Officer Hyma, who was also in the car, got out and Officer

Rodriguez lost track of her as he made a three-point turn to go back down the alley he was in. After looping around to the Wolcott St. side of the lot, Officer Rodriguez found Officer Hyma with two individuals whom she had stopped.

¶ 32     The two individuals were patted down and detained on the street and then in another police vehicle that responded to the scene. Officer Rodriguez and the third officer on the scene, Officer Soto, were tasked with completing an investigative stop report (ISR) for each of the two individuals. The ISRs included the individuals' names, addresses, demographics, and a description of their clothing. Neither individual was charged and both were released. The ISRs described one of the individuals, Leron Nelson, as a 20-year-old black male, 5'10", 175 pounds, with a short hairstyle. The other individual, Qumonta Austin, was an 18-year-old black male, 5'9", 150 pounds, with a short hairstyle. Officer Rodriguez did not note in his subsequent general offense report that the two individuals had been stopped or that ISRs had been generated, because he did not believe that there was any connection between the individuals and the below-described firearms.

¶ 33     Officer Rodriguez searched the vacant lot with other officers and they located five firearms throughout the lot. Importantly, Officer Hyma found a black semiautomatic pistol with a serial number matching a Smith & Wesson .40 caliber handgun which, according to testimony from an ATF agent, was purchased by an out of state buyer and mailed to Anthony Morgan, another of Corey's brothers. Detective Murphy testified that he authored a report about the recovery of this firearm and the match between the weapon and the casings found near the victim's body.

¶ 34     Officer Rodriguez testified that in preparation for defendant's trial, he went to meet with an assistant state's attorney on multiple occasions, but did not, until the day before his

16

testimony, recall generating the ISRs. On cross-examination, Officer Rodriguez confirmed that he had included in his report a description of a man with long black dreadlocks fleeing the scene of the music video recording, but stated that he had never seen the man himself and had received that description from one of the other officers on the scene.

¶ 35    After he was located subsequent to the disclosure of the ISRs, Nelson, the subject of one of the ISRs, was called before the court outside the view of the jury to be questioned by the parties. Nelson stated that on the night that he was stopped by Officer Hyma, he was walking with his friend, Austin, in the area of 70th and Wolcott and saw a music video recording underway in a vacant lot with about 15-20 people present. He and Austin stopped and "spectated for about two, three minutes." Nelson stated that he did not see anyone with firearms that night. When the police arrived, Nelson and Austin ran about a block before they were stopped by police.

¶ 36    Austin, the subject of the other ISR, was also questioned outside the presence of the jury. Austin's account largely aligned with Nelson's, but not entirely: Austin confirmed that he saw "a couple [of] people" pull out three different guns and wave them at the camera that was filming. He described the men waving guns as African-American men with dreadlocks and black clothing. Austin also testified that he and Nelson watched from across the street rather than on the sidewalk immediately adjacent to the lot.

¶ 37    Immediately after questioning Nelson and Austin, the court heard defense counsel's motion for a mistrial based on the State's discovery violation with regard to the ISRs. Defendant's argument focused largely on the fact that Nelson and Austin very generally matched the descriptions witnesses had given, which is to say they were black males, whose hair may have been in styles that matched the general descriptions given regarding the crime

years earlier. Defendant argued that that physical similarity, in combination with their being stopped near the time and place where the murder weapon was recovered, made them possible alternative suspects about whom defense counsel had not had the opportunity to investigate or question other, already-called witnesses. The circuit court noted that all witnesses who had been called could be recalled and defense counsel still had approximately a week to investigate. The circuit court denied the motion without prejudice. Defendant raised the motion again two days later and the circuit court again denied the motion, opining:

> "Obviously, this situation is not ideal to say the least. It is problematic.
>
> ***
>
> And while, as a court, I can certainly appreciate the defense frustration and concern, I still have to look at that under at least my understanding of the law and given the totality of the circumstances with everything that's available to me now, despite this messy blob dropped in the middle of this trial. On balance, the court cannot say that what was not timely disclosed was favorable material to the accused to the point that it would warrant a mistrial.
>
> ***
>
> The court believes that mistrial is not the appropriate sanction. *** Whether or not certain other instructions to the jury might be appropriate will need to wait until we get to that point once the court has heard all the evidence and defenses to determine what, if any, other instructions, sanction may be necessary and warranted."

¶ 38     The circuit court provided an instruction to the jury informing them that they were allowed, but not required to assume that evidence in the possession of one party and not timely disclosed would be adverse to that party. After deliberation, the jury found defendant

guilty of first-degree murder and found that it was proven that defendant personally discharged a firearm that proximately caused death to another person, and that the victim was under 12 years of age.

¶ 39                                    C. Sentencing

¶ 40        Immediately after giving defendant an opportunity to speak on his own behalf, the circuit court prefaced its sentencing for defendant and his co-defendant, Corey, with a lengthy soliloquy:

> "The tragic loss of a good friend and brother and the galling injury to your mother is painful to say the least, but vengeance is not yours, nor will the law tolerate retaliation and vigilante justice.
>
> Like sands through the hourglass, the days of our lives are like a speck of dust slipping away in front of us, falling through the fingers of [F]ather [T]ime. The sands of life run through the hourglass without stopping, letting us know that our end is near. Unlike a clock with its endless sweeping cycles, the hourglass of life has a definite end, and we can ill afford to allow lawless and brazen shootings, murders and back and forth retaliation to needlessly snuff out a life before our created time to shuffle off this mortal coil.
>
> We have gun-toting adults and children indiscriminately shooting and taking out innocent lives in the process. Many couldn't shoot the side of a barn from two feet away, yet they have a gun. We see individuals in the name of a gang taking up roles in furtherance of criminal activity, and no matter their role, they are responsible."

¶ 41      The circuit court spoke at some length about the theory of accountability, under which Corey was charged, and the breadth of roles an individual might play and find themselves accountable for a murder, even if that murder was not planned. The circuit court then stated:

"During pretrial proceedings I received a large binder detailing shootings and murders between various gang members and factions in this area of the city. The ruthless cycle of gang shootings and murders, the tit for tat retaliations covered a period from May of 2012 through October of 2015 with the murder of Briana Jenkins and the November 2015 murder of Tyshawn Lee and the March 2016 shooting of Robin Matthews. It was a disheartening and terrifying reading to say the least.

Our communities have turned into virtual war zones with indiscriminate shootings and senseless retaliations. Innocent citizens are caught in the crossfire. People can't freely walk around and enjoy their neighborhood or play in the park. School kids need safe passage workers to line the streets just to get home from school. Now people shut themselves in their homes to avoid the violence outside yet still fall victim to bullets intended for someone on the street flying through the walls of their homes. Our communities are not fair game in the spoils and pillaging and vicissitudes of gang war.

We constantly hear that someone going about their business, trying to do good, excel in school, or just make a better life for themselves and their families are struck down by untargeted violence. Invariably someone says they were in the wrong place at the wrong time.

No. They were in the right place at the right time, down the right path of life doing the things they rightly should be doing. They were not in the wrong place and

the wrong time, and if we let that saying continue to prevail, there will be no place left to retreat.

Already, you can't retreat into the safety of your home. You can't leave the neighborhood and retreat to downtown. You can't retreat from downtown to the suburbs. Now we all have to deal with it.

Where does this stop? Where does this mind-numbing, debilitating, senseless violence stop? It stops with grandmas, mamas and innocent children simply trying to play at a park. Grandmas, mamas, kids all matter. They all matter. Grandmas, mamas, kids and all are not fair game, and they matter to us. Whether they have been in this world only eight seconds, eight minutes, or eighty years, they matter.

With respect to both defendants, for purposes of sentencing, the Court has considered the evidence at trial, the gravity of the offense, the Presentence Investigation Report, the financial impact of incarceration, all evidence, information and testimony in aggravation and mitigation, any substance abuse issues and treatment, the potential for rehabilitation, the possibility of sentencing alternatives, and with respect to [defendant], the fact that he was under the age of 25 at the time of the offense, the victim panel statements and all hearsay presented and deemed relevant and reliable."

¶ 42    The circuit court sentenced defendant to 90 years in the Illinois Department of Corrections, plus three years of mandatory supervised release. Defendant filed a timely notice of appeal and this appeal follows.

¶ 43                                II. ANALYSIS

¶ 44        Defendant asserts that the circuit court erred in denying his motion for continuance, in denying his motion for a mistrial based on the State's failure to timely disclose the ISRs from Nelson and Austin, and that the circuit court considered inappropriate factors in determining defendant's sentence. We disagree with regard to all three arguments and affirm the decision of the circuit court.

¶ 45                            A. Motion for Continuance

¶ 46        Defendant argues that the circuit court abused its discretion by denying the motion for continuance submitted by trial counsel after defendant had counsel reappointed on the eve of trial rather than proceeding to trial *pro se*. More specifically, defendant argues that the circuit court's denial of defendant's motion for a continuance violated defendant's right to a fair trial and effective counsel, and that the circuit court failed to consider the factors enumerated in *People v. Walker*, 232 Ill. 2d 113 (2009), before denying the motion, or else the circuit court's weighing of those factors was so inappropriate as to constitute an abuse of discretion.

¶ 47        "It is well settled that the granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion." *Id*. at 125. "However, where it appears that the refusal of additional time in some manner embarrassed the accused in preparation of his defense and thereby prejudiced his rights, a resulting conviction will be reversed." (Internal quotation marks omitted.) *Id*. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 48    "Whether there has been an abuse of discretion depends upon the facts and circumstances in each case, and there is no mechanical test for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend." *Walker*, 232 Ill. 2d at 125. "Factors a court may consider in determining whether to grant a continuance request by a defendant in a criminal case include the movant's diligence, the defendant's right to a speedy, fair and impartial trial and the interests of justice." *Id*. "Other relevant factors include whether counsel for defendant was unable to prepare for trial because he or she had been held to trial in another cause, the history of the case, the complexity of the matter, the seriousness of the charges, as well as docket management, judicial economy and inconvenience to the parties and witnesses." (Internal citations omitted.) *Id*. at 125-26.

¶ 49    In *Walker*, when the case was called for trial, defense counsel immediately informed the court that she had mistakenly recorded the trial day incorrectly on her calendar and had only discovered her mistake the night before trial, when defendant contacted her. *Id*. at 126. Defense counsel had also been on trial into the evening hours on the prior two nights. *Id*. As a result, she told the court, she was not ready to go to trial. *Id.* The circuit court replied: " 'This has been set. I am sorry. We will pass this case for trial.' " *Id*. at 126-27. When defense counsel again insisted she was not ready for trial, the circuit court cut her off before she could even specify how long of a continuance she needed. *Id*. at 127. The court stated " 'it is irrelevant' " and "in no uncertain terms, indicated that the matter was closed." *Id*. Here, defense counsel was present throughout the entire span of the case, even if some of that time was as standby counsel. Additionally, defense counsel had another two days of warning and made no mention of being held to trial on other matters in the time since the defense

23

team had been alerted that it should be ready to take things over again. Lastly, but importantly, here, the circuit court allowed defense counsel to explain the situation at length.

¶ 50        In reversing the lower court's decision, our supreme court in *Walker* noted that the lower court did not obtain the information necessary to make a considered decision on the motion, notably the length of the requested continuance. *Id.* The *Walker* court further noted that some of the relevant factors weighed in favor of granting the continuance, as well as the fact that the circuit court evinced significant hostility toward defense counsel without an apparent basis in the record. *Id.* at 127-28. Here, the circuit court showed no such hostility, and the record demonstrates no similar lack of relevant information. Based on the above, the case at bar is dissimilar to the facts of *Walker*, which our supreme court repeatedly reiterated to be "unique" and "specific." *Id.* at 130-31.

¶ 51        There is a notable difference between the curt, arbitrary, and dismissive tone and actions of the circuit court in *Walker* and the stolid insistence on schedule from the circuit court in this case. In this case, the circuit court reiterated again and again, from at least the time of defendant's initial request to proceed *pro se*, that "there will be no delay." The circuit court's actions demonstrate that this assertion was not without due consideration, as the trial had initially been set for months prior to the eventual trial date and was delayed to handle pre-trial matters, and because the start of trial was again moved from September 9 to September 13 to give defendant more time to prepare. Accordingly, at a minimum, the record does not indicate that the circuit court was arbitrarily insistent on a given date without any consideration of defendant's circumstances.

¶ 52        Defendant cites a number of inapposite cases, including the so-called Scottsboro Boys trial, *Powell v. Alabama*, 287 U.S. 45 (1932), that present scenarios of clear prejudice to the

defendant's case. In some cases, unlike this one, counsel was either never appointed or first appointed at the eleventh hour. *Id.*, *People v. Kunowski*, 360 Ill. 416, 418 (1935) (defense counsel was retained the morning of trial). We need not address this argument as the facts do not support the contention that defendant was deprived of counsel at any stage. To compare this case to cases like *Powell*, in which counsel was appointed for the first time on the eve of trial, is disingenuous at best. At all relevant stages, for years leading up to trial, defendant was represented by counsel. In the approximately one and half years between Ivory's appointment and the start of trial, he was represented by the same counsel that ultimately represented him at trial, with a three-week period of self-representation immediately before trial. Defense counsel cited defendant's refusal to communicate with her as standby counsel during his period of self-representation as one of the reasons for her unreadiness to proceed to trial. Even if his decision to self-represent and reject the assistance of standby counsel was to his detriment or to the detriment of defense counsel, that does not represent an infringement of defendant's right to counsel, but rather, at worst, a foolhardy invocation of his rights. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) ("Although a court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of that respect for the individual which is the lifeblood of the law."). Defense counsel had been working on this case for well over a year and had three days' warning from the court that he would be reinstating counsel. We cannot say that defense counsel did not have adequate time to prepare a defense.

¶ 53    In other cases cited by defendant, counsel was timely appointed, but a refusal to grant additional time clearly prejudiced the defendant. *People v. Goff*, 299 Ill. App. 3d 944 (1998) (circuit court refused to reopen the case to allow for key testimony from a witness not

previously available), *People v. Moore*, 397 Ill. App. 3d 555, 561 (2009) (circuit court prevented an alibi witness from testifying by insisting upon a planned end date for trial). The circumstances surrounding the circuit court's denial of the motion to continue in this case do not present the same sort of obvious and dire consequences, and defendant does not indicate that such consequences actually resulted.

¶ 54    In fact, defendant indicates no specific way in which the lack of a continuance "embarrassed the accused in preparation of his defense and thereby prejudiced his rights." *Walker*, 232 Ill. 2d at 125. Defendant notes that defense counsel was reappointed the day before jury selection was to commence, that co-defendant Edwards had recently pleaded guilty, that there were defense witnesses who had not been served, and that only lead counsel and one of the three other members of the defense team would be able to be present for jury selection. However, defendant does not highlight any specific consequence, nor do we see any evident prejudice, with regard to any of these less than ideal circumstances. As we have already established, the same defense counsel represented defendant for well over a year prior to trial and subsequently served as standby counsel when defendant was representing himself, so the last-minute reappointment is not obviously prejudicial. The circuit court had previously suggested that trial would proceed with either a triple jury or a double jury with defendant's jury separate in either scenario, so Edwards' guilty plea had no clear effect on defendant's jury selection strategy. The circuit court ordered that the prosecution put defense counsel in contact with the unserved witnesses and defense counsel stated on the record that the court's order resolved that issue. Lastly, there is no indication in the record that any member of defense counsel was ever unprepared to represent defendant due to only half of

the team being present at jury selection. Accordingly, we cannot find that defendant was prejudiced by the circuit court's denial of his motion for a continuance.

¶ 55    Defendant also argues that the circuit court failed to consider the relevant *Walker* factors in denying defendant's motion for a continuance. Defendant asserts that no serious argument can be made that the circuit court "engaged in thoughtful analysis" regarding the *Walker* factors, but defendant mistakenly focuses only on the moment of defense counsel's reappointment. The record reflects that the circuit court had been considering the possibility of a motion for continuance for some time before the motion was made. Additionally, moments before trial counsel's motion for a continuance, defendant himself had similarly moved for a continuance. Although the circuit court did not recite the factors it considered, the circuit court "is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record." *In re N.B.*, 191 Ill. 2d 338, 345 (2000). Given the prolonged time period over which the possibility of a continuance was considered and that the circuit court allowed defense counsel to lay out her arguments for a continuance at length before making its decision, we see nothing about the briefness of the court's comments on the matter that evinces a complete lack of consideration of appropriate factors, nor consideration of inappropriate factors.

¶ 56    As such, all that remains on this issue is defendant's argument that the circuit court incorrectly weighed the factors. In *Walker*, our supreme court enumerated eight factors that a court may consider, so we will review each in considering whether the circuit court's decision rises to the level of an abuse of discretion. These factors consist of three loftier, constitutionally-minded factors and five more practical factors concerned with the nuts and bolts of trial preparation and procedure.

¶ 57    First, we must consider the movant's diligence. Defendant asserts that "[i]t is unclear how [defendant's] attorneys could have been any more diligent." However, our concern is not only defense counsel's diligence, but defendant's diligence during his period of self-representation. In many circumstances, the line between a party's actions and the actions of the counsel representing that party are blurred, since counsel is acting as the party's representative. Here, however, the distinction is key: it would have been reasonable for the circuit court to weigh this factor against defendant, as his decision to represent himself and, while representing himself, falsely hold himself forth as ready for trial to encourage the circuit court to afford him that opportunity on the eve of trial, only to later admit that he was not, after all, ready for trial, could be fairly seen as an egregious lack of diligence. Once again, we reiterate that it is defendant's rights that we are concerned with, not defense counsel's; whatever frustration defense counsel may have felt with the situation, it was defendant's own assertion of his right to represent himself that led to counsel's last-minute reappointment.

¶ 58    Second, we must consider defendant's right to a speedy, fair and impartial trial. Defendant asserts that there was no danger to defendant's right to a speedy trial even if the motion had been granted, and we agree. Defendant argues, however, that defendant's right to a fair and impartial trial was violated by the denial of the motion for continuance. Here, defendant cites *People v. Jefferson*, 35 Ill. App. 3d 424 (1976), a case in which the defendant was arraigned, counsel was appointed, and trial commenced all in a single day. Once again, it is disingenuous at best to compare the case at bar to one in which counsel was *first* appointed on the day or eve of trial. Defendant's argument elides the vast practical and factual difference between the scenarios presented in cases such as *Jefferson* and the case at bar. In

*Jefferson*, *Powell*, and cases of their ilk, a defendant was forced to trial with no counsel or just-appointed counsel with no opportunity to prepare for that trial, whereas here defense counsel had over a year of experience with the case and had been deeply involved in pretrial litigation and served as standby counsel for a three-week period before being reappointed. The argument for similarity is stretched not just thin, but to the point of breaking. To compare such egregious travesties of justice to the facts of this case is frankly wrong. Defendant makes no other, more cognizable argument regarding this factor and we see no threat to defendant's right to a fair and impartial trial in the circuit court's denial of the motion for continuance in these particular circumstances.

¶ 59    Third, we must consider the interests of justice. Defendant's argument on this factor cites *Jefferson* at even greater length and is little different except insofar as it insists that defense counsel was not attempting to somehow thwart justice by requesting a continuance. Given the circumstances, in which defense counsel was present throughout all relevant proceedings and the court successfully curing the significant matter of the unserved defense witnesses, we see no threat to justice in the circuit court's denial of the motion for continuance.

¶ 60    Fourth, we must consider whether counsel for defendant was unable to prepare for trial because she had been held to trial in another cause. There is no indication that this was the case. Although continuing with the trial as rescheduled during the time defendant was representing himself meant that two of the four members of his defense team were not present for jury selection, his lead counsel was nonetheless present and defendant makes no mention of any prejudice to his case resulting from the absence of those two members of the defense team, nor even whether they held particular roles within the defense team that made their presence necessary or important.

¶ 61      Fifth, we must consider the history of the case. Defendant argues that Edwards pleading guilty during defendant's period of self-representation and the change that could have meant for whether the case would be a triple jury or a double jury, tilts this factor in favor of granting the motion for continuance. In every instance in which split juries were discussed in the record, the plan presented was for defendant to have a separate jury, whether or not Edwards and Corey shared a single jury or had separate juries for their trials. It is unclear how a change in the already-separate jury arrangements for co-defendants would require additional preparation from defense counsel. The circuit court expressed some concern about defendant's ability to navigate considering whether to plead guilty in the wake of Edwards' plea, but defendant insisted that he had no interest in a guilty plea and the prosecution added that there were no plans to offer him a plea deal. While defense counsel argued in her motion for continuance that she had no opportunity to discuss trial strategy with defendant since Edwards' guilty plea, there is no contention on appeal that such lack of discussion had any impact on defendant's representation or ability to present his defense. Nor, for that matter, is there any suggestion in the record or upon appeal that defense counsel was not able to have that discussion subsequently. With regard to the history of the case, it is notable that defense counsel had years to prepare this case before the three weeks during which defendant represented himself, and Ivory herself had a year and a half. As such, we cannot say this factor favors granting the continuance.

¶ 62      Sixth, we must consider the complexity of the matter. Defendant argues that the complex nature of the case, with multiple co-defendants, numerous witnesses, and novel scientific evidence, favored granting the continuance. Defense counsel, however, had been familiar with all of those matters for some time, and was the attorney present representing defendant

during the *Frye* hearing regarding the expert witness who was to present that novel scientific evidence. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). It would seem this factor is relevant for those instances in which it would be difficult for a recently-appointed attorney to become exactly as well-versed in the complex matters underlying a case as Ivory herself was in this case. While we agree that this case was complex, we see no indication that defense counsel needed more time to grapple with that complexity.

¶ 63        Seventh, we must consider the seriousness of the charges. The charges in this case are dire indeed, but we see nothing about the gravity of the charges that made a motion for continuance more necessary in these circumstances. Defendant and his counsel had been aware of these very serious charges in this very high-profile case for some time, which is all the more reason to find questionable the suggestion that defense counsel was so unprepared for trial that the lack of a continuance prejudiced defendant.

¶ 64        Eighth, we must consider docket management, judicial economy, and the inconvenience to the parties and witnesses. Defendant notes that the State did not object to the continuance and, while it noted potential inconvenience to out of state and international witnesses and the costs associated with those witnesses, it "demurred to the court." Whether the other party objected to the continuance is not one of the *Walker* factors. The inconvenience noted by the State in the process of declining to object, on the other hand, is one of the relevant factors. Defendant argues that the circuit court was required by *Walker* to make a record regarding factors it found relevant, but that is a misreading of *Walker*. The *Walker* court made no such pronouncement that explicit articulation of factors was mandatory; rather, that the circuit court's failure to comment on these matters, along with the interests of justice, the complexity of the case, and the severity of the charges, was merely an additional factor in its

finding that the circuit court abused its discretion. *Walker*, 232 Ill. 2d at 127. We read *Walker* to be focused significantly on the circuit court's hostile demeanor and refusal to allow counsel to even explain how much of a continuance she needed and for what purposes. In that context, a failure to explicitly mention the relevant factors makes it clearer still that the court was not engaging in the necessary analysis. No such context exists here and so we cannot say the circuit court erred by failing to explicitly articulate the factors it was considering.

¶ 65        After reviewing all of the *Walker* factors, we cannot say that the circuit court's decision constituted an abuse of discretion. Accordingly, we affirm the circuit court's denial of the motion for continuance.

¶ 66                            B. *Brady* Violation

¶ 67        Defendant argues that the circuit court abused its discretion by denying defendant's motion for a mistrial based upon the State's failure to disclose two ISRs generated when police stopped two individuals near the vacant lot where the murder weapon was recovered. The ISRs in question were allegedly remembered and found two weeks after the start of defendant's trial and were provided to defendant as soon as the prosecution became aware of them. Defendant asserts that this failure to disclose the ISRs, whether intentional or not, constituted a violation of his Fourteenth Amendment due process rights under *Brady*, under which "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963); U.S. Const., amend. XIV.

¶ 68        "To succeed on a *Brady* violation claim, a defendant must establish (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the

32

evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." (Internal quotation marks omitted.) *People v. Montanez*, 2023 IL 128740, ¶ 82. "Evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Harris*, 206 Ill. 2d at 311. The examination is not concerned with the sufficiency of the evidence; "[r]ather, a defendant must show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *Id*. at 311-12. "The *Brady* rule extends to favorable evidence known only to police investigators and not to the prosecutor trying the case." (Internal quotation marks omitted.) *Montanez*, 2023 IL 128740, ¶ 82.

¶ 69       It is undisputed that the State failed to timely disclose the ISRs, so the only questions before us are favorability, materiality, and prejudice. Defendant contends that the evidence was material, but his argument to that end is unclear. In his brief, defendant describes at length the standard to be applied in determining whether evidence was material, and asserts that this case is factually comparable to *People v. Carballido*, 2015 IL App (2d) 140760, but makes little attempt to apply the law of *Carballido* to the facts of this case.

¶ 70       In *Carballido*, the defendant was charged with first-degree murder under a theory of accountability. *Id*. ¶ 5. The defendant in *Carballido* admitted in a written statement that he was aware that the shooter had a firearm with him when defendant drove him to the scene of the crime, but defendant asserted that the statement regarding the gun was false and coerced. *Id*. ¶ 87. It was proven that at least one of the few details included in that written statement was false. *Id*. The only other evidence establishing defendant's knowledge of the firearm,

which was key to the theory of accountability, consisted of statements from defendant's sister. *Id.* ¶ 80. Although the defendant's sister testified that defendant had not told her he was aware of the firearm, a police detective testified that she had told him as much and said detective provided a written report detailing as much. *Id.* The State failed to timely disclose the field notes written by that officer that did not include the statement from the defendant's sister and therefore contradicted his testimony that the written report he provided was based on his field notes. *Id.* ¶ 68-69. The *Carballido* court concluded that, without the discovery violation the defendant would have been able to impeach that key piece of testimony, so it was reasonably probable that the jury would have considered the case in a different light. *Id.* ¶ 89.

¶ 71 Defendant states that "[n]o serious debate can be had as to the high relevance of [defendant] being informed in the summer of 2017 (versus on September 24, 2019, two weeks into his high-profile jury trial) that two men, matching the general descriptions of the potential offenders in Lee's murder, were seized by police moments before the weapon used to murder Lee was found." Defendant states that even if Austin and Nelson, the two individuals in question, could not be linked to the murder weapon or the offense, defendant would have had more time to investigate based on Austin and Nelson's fresher recollections of the night they were stopped by police and to plan a trial strategy based upon the results of such investigation. We interpret this as an argument as to the materiality of the ISR evidence, even though that prong of the analysis is not clearly invoked.

¶ 72 We see little similarity between *Carballido*, where the undisclosed evidence held significant impeachment material on a matter of fact that was absolutely crucial to the legal theory of the case and where other paths to the same end were either extremely flawed (the

defendant's possibly coerced and at least in part false written confession) or completely unsuccessful (the defendant's sister's unexpected testimony that defendant had not in fact told her about the firearm). Defendant has cited a case with compelling facts, but has in no way demonstrated that those facts are comparable to this case. Defendant makes much of the *Carballido* court finding the withheld evidence in that case to be material in the context of "(1) the high relevance of the suppressed evidence; (2) additional errors stemming from and surrounding the discovery violation * * *; and (3) a significant dispute over the reliability of other key evidence against defendant." *Id.* ¶ 79. However, the "relevance," which defendant seems to use as equivalent to materiality, of the withheld evidence in this case does not compare to the withheld evidence in *Carballido*.

¶ 73    Here, the evidence that defendant suggests could have been gleaned from more time to interview Nelson and Austin is purely speculative. The only information elicited from the two when they were subjected to questioning before the court that defendant suggests could be meaningful is Austin's statement that a black man with dreadlocks was waving a firearm in the lot just prior to the discovery of the murder weapon. Defendant was already aware that a man by that description was seen fleeing from the scene before hearing from Nelson and Austin. Defendant argues that with more time to investigate and with Nelson and Austin's memories fresher and more recent, information on an alternative suspect could have been available to the defense and that information could have been used as the basis for defendant's trial strategy. Both Nelson and Austin stated that they did not know anyone else present at the vacant lot that night. Accordingly, at best, what Nelson and Austin could have provided is a clearer description of one of dozens of unknown individuals in the lot, who had contact with one of several firearms recovered from the scene. This suggestion is sufficiently

speculative such that we cannot say that there is a reasonable probability that timely divulgence of the ISRs would have changed the result of the trial. Defendant has not demonstrated that the withheld evidence was material. Accordingly, we cannot find that the court's decision to deny defendant's motion for a mistrial based on the withholding of the ISRs and instead offer a jury instruction on the matter was erroneous, much less an abuse of discretion.

¶ 74                                    C. Sentencing

¶ 75        Defendant argues that the circuit court abused its discretion when it "repeatedly and at length considered factors in aggravation not supported by the evidence and relied on its own personal beliefs and experiences." Defendant asserts that the circuit court spent "the vast majority" of its explanation for defendant's sentence on voicing what defendant calls "frustration with generalized violence in Chicago and its suburbs."

¶ 76        Defendant acknowledges that this alleged error was not preserved at trial and asks that we review the error as plain error or, alternatively, review trial counsel's failure to raise it as ineffective assistance of counsel. "To preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, a "narrow and limited exception" exists where an appellant can demonstrate plain error. *Id.* at 545. The first step of establishing plain error is to "show that a clear or obvious error occurred." *Id.* In the case of ineffective assistance of counsel, a defendant must show that counsel's representation "fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to 'deprive the defendant of a fair trial, a trial whose result is reliable.' " *People v.*

*Albanese*, 104 Ill. 2d 504, 525 (1984) (quoting *Strickland v. Washington*, 466 U.S. 688 (1984)).

¶ 77     "It has long been established that the trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive." *People v. Jones*, 168 Ill. 2d 367, 373 (1995). "Where the sentence chosen by the trial court is within the statutory range permissible for the pertinent criminal offense for which the defendant has been tried and charged, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed." *Id*. at 373-74. "In rendering a sentence, a trial judge is presumed to have relied upon only competent and reliable evidence. Additionally, it is defendant's burden to overcome this presumption." *People v. Griffith*, 158 Ill. 2d 476, 497 (1994).

¶ 78     Defendant cites to *People v. Dameron*, in which our supreme court opined: "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." 196 Ill. 2d 156, 171-72 (2001). The judge in *Dameron* "spoke at length about social science statistics and vague generalizations about crime he uncovered through his own investigation" and "[a]n excerpt from the *** book recited by the judge also conflict[ed] with evidence in the case." *Id*. at 176. There is no evidence that the circuit court conducted any such private investigation in the case at bar, so *Dameron* is factually inapposite.

¶ 79     Defendant's further citations in support of the proposition that a judge cannot consider private knowledge similarly present scenarios that are inapplicable to this case. *People v. Cunningham* has no factual relevance at all and merely recites this statement of law. 2012 IL

App (3d) 100013, ¶ 14. In *People v. Jackson*, 409 Ill. App. 3d 631, 649-50 (2011), the circuit court made a statement about how a medication is used without that information being introduced by the relevant expert witness, the circuit court stopped the expert witness from testifying as to a simple factual matter with an assertion that it was already familiar with the matter, and the circuit court relied upon its own opinions about IQ testing in disregarding expert testimony that stated that IQ testing was relevant to his analysis. In the case at bar, defendant has not shown that the circuit court allowed evidence generated from its personal knowledge to supplant the evidence presented at trial.

¶ 80    In *People v. Rivers*, 410 Ill. 410, 415-16 (1951), the court similarly generally decried violence in the area before rendering its sentence. However, the *Rivers* court stated that "[t]he courts must put an end to these vicious killings by imposing suitable punishment upon these youngsters for their crimes" and cited statistics, which were not in the record, about the number of unregistered guns in the city. *Id*. In the case at bar, the record evinces neither that the circuit court referred to specific facts outside of the record, nor that the circuit court based its decision on any such private knowledge. Though the case at bar did not concern a stray bullet or the larger issue of fear of gang violence, the circuit court's commentary made use of nothing more than evidence in the record and general knowledge of which any resident of Chicago would be aware.

¶ 81    Defendant cites to *People v. Rosa*, 206 Ill. App. 3d 1074, 1084 (1990), in which the circuit court spoke broadly about the defendant being the result of "the lack of a father" and the "stupidity and slutliness of women." That court called the defendant "slovenly" and "stupid," and spoke generally about the "cowardice" of street gang members." *Id*. The circuit court's commentary in the case at bar is about the issue of gang violence, which is not so far

afield as the circuit court's broad social commentary in *Rosa*. While we acknowledge that the murder in the case at bar was targeted and not an accidental killing, we do not believe the circuit court's comments on the larger issue suggest as much, nor that it treated this killing as indiscriminate in determining the sentence.

¶ 82    Here, it is notable that none of the language referenced by defendant was framed by the circuit court as the reasoning behind its sentence, but rather appears to have been a soliloquy designed to make a statement about a larger issue, especially considering that the case garnered significant press attention and was, as one attorney called it on the record, "the most sensational murder trial that this county [had] seen in 10 years." The circuit court concluded its soliloquy by asking where this larger issue of gang violence stops and by referring to the specific language from the case at bar in his answer: "It stops with grandmas, mamas and innocent children simply trying to play at a park." By laying out the larger issue of gang violence and then making reference to the particular language in this case, the circuit court emphasized the particular depravity of the intentional killing of a 9-year-old child, which was explicitly a relevant factor in delivering an extended-term sentence. 730 ILCS 5/5-5-3.2(b)(3)(i) (West 2018) (allowing courts to impose an extended-term sentence where a felony is committed against a person under 12 years of age).

¶ 83    Immediately after the circuit court's soliloquy, it stated the factors that it considered, which included the relevant and required statutory considerations, 730 ILCS 5/5-4-1(a) (West 2018), with the addition only of "the seriousness of the offense," which our supreme court has noted as a relevant factor to be weighed. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). However, "personal comments or observations are generally of no consequence where the record shows the court otherwise considered proper sentencing factors." (internal quotation

marks omitted.) *People v. Walker*, 2012 IL App (1st) 083655, ¶ 33. As the State points out, the sentence defendant received was arguably near the low end of the applicable sentence range when an extended sentence is considered, which, as aforementioned, was justified by the age of the victim alone. Under section 5-4.5-20(a) of the Unified Code of Corrections, a sentence for first degree murder is to be not less than 20 years and not more than 60 years, but an extended sentence is to be not less than 60 years and not more than 100 years. 730 ILCS 5/5-4.5-20(a) (West 2018). Under section 5/5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections, where, as here, it is found that "during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018). Accordingly, the permissible range was 45 years to life, but with the option to impose an extended sentence of 85 years to life.

¶ 84    Even where a court may rely on an improper aggravating factor in sentencing, "where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke*, 96 Ill. 2d 327 (1983). There is no indication in the record that the decision to impose an extended sentence was the result of a general distaste for gang violence rather than the fact that the victim was a 9-year-old child. The circuit court's focus on "grandmas, mamas, and innocent children" indicates the importance the circuit court was placing on the age of the victim. In that context, even if we accept that an improper factor was considered, we cannot say that a sentence of 90 years was significantly affected by such consideration where the extended sentence range was 85 years to life imprisonment.

Accordingly, because we find no clear or obvious error to support a claim of plain error, we need proceed no further in the plain error analysis, and we find that the issue is forfeited on appeal. With regard to the alternative theory of ineffective assistance of counsel, defendant has not shown that trial counsel's performance fell below an objective standard of reasonableness as we see no error warranting an objection, and so we affirm the sentence of the circuit court.

¶ 85                                III. CONCLUSION

¶ 86        For the foregoing reasons, we affirm the circuit court's orders on defendant's motion for continuance and motion for mistrial, and we affirm the circuit court's sentence.

¶ 87        Affirmed.